**Robert HEBEL, personal representative for Richard C. Hebel, Deceased, Appellant (Plaintiff Below).**

v.

**CONRAIL, INC., Appellee (Defendant Below).**

**No. 1–482A94.**

Court of Appeals of Indiana, First District.

Jan. 26, 1983.

Rehearing Denied March 1, 1983.

Douglas C. Holland, Lawrenceburg, for appellant.

John F. Stroup, Lawrenceburg, for appellee.

ROBERTSON, Presiding Judge.

Robert Hebel (plaintiff), the personal representative of Richard C. Hebel's estate, appeals the negative judgment rendered on his claim for damages against Conrail, Inc. (Conrail), which was brought pursuant to the Federal Employers' Liability Act (FELA), 45 U.S.C. § 51 *et seq.* and which sought compensation for injuries his father, Richard Hebel (Hebel), received as a result

of guarding a chemical spill site while employed as a policeman for Conrail.[1]

We reverse.

Robert raises several issues on appeal; we will address two of the issues which involve reversible error.

The facts reveal that a Conrail train derailed just west of Guilford, Indiana, at approximately 6:30 A.M. on February 22, 1977. A boxcar and a tankcar were involved. The tankcar was ruptured in the accident and the liquid chemical which it contained spilled into a ditch running along the north side of the tracks. Conrail's supervisor of train operations, who was in charge of the dispatcher's office, became aware of the accident and the resulting chemical spill shortly thereafter. By checking Conrail's records, he discovered that the tankcar contained a shipment of acrylonitrile for Monsanto. One of the supervisor's duties was to contact Chemtrec, an organization formed by shippers to provide information on hazardous chemicals in emergencies such as derailments. Chemtrec informed him that acrylonitrile is a toxic flammable liquid which is harmful if inhaled or absorbed through skin. Chemtrec further explained that anyone entering the spill area should wear self-contained breathing apparatus and fully protective clothing including rubber boots.

Approximately 35,000 gallons of acrylonitrile was spilled into the ditch and it drained to the east 500 feet to 600 feet where it flowed south through a culvert under the tracks towards a nearby stream. Because of the spill's size and the danger that it would reach the stream, and ultimately the Ohio River, many people were in the spill area shortly after the accident occurred attempting to dam the flow of acrylonitrile and to remove the damaged railroad cars. The derailed boxcar contained a shipment of particle board which was strewn in the ditch and became saturated with acrylonitrile.

Despite Chemtrec's admonishment, people working in the area, and particularly Conrail's policemen, were not warned of acrylonitrile's dangers or given protective equipment. An industrial hygienist from the Indiana State Board of Health conducted air tests at the spill site and the surrounding area between 11:30 A.M. and noon on February 22. The readings indicated an airborne concentration of acrylonitrile from 10 parts of acrylonitrile per one million parts of air (p.p.m.) to 20 p.p.m. at a distance of 10 feet to 20 feet from the tankcar. Tests taken near the ditch did not reveal detectable amounts of acrylonitrile. The hygienist conceded that the testing procedure used could have been inaccurate and that it had a normal variance of plus or minus 25%. Based upon the test results, the hygienist did not recommend use of self-contained breathing apparatus.

Several people were overcome by acrylonitrile during the first day of the clean-up. Workers described having headaches, congested nasal passages, nausea, dizziness, eye irritation and raspy voices. Some workers also said they could smell acrylonitrile as far away from the spill site as the parking lot on the west edge of Guilford which was used as a staging area. The parking lot was approximately 1800 feet east of the spill and 1100 feet east of the culvert. Some workers said they smelled the acrylonitrile and experienced exposure symptoms on February 23 and 24, the first and second days after the accident, in addition to February 22, 1977.

In this context, Hebel was ordered to patrol the derailment site from 4:00 P.M., February 23, 1977 to 4:00 A.M., February 24, 1977. His notebook reflects he was to guard a load of "scrap press wood".[2] Hebel

---

1. Initially, Richard filed the complaint, but he died while this litigation was pending and Robert, as the personal representative, was substituted as plaintiff.

2. At trial, a major point of contention was whether Hebel left the parking lot and went to the actual derailment site and whether the recovered particle board was in the parking lot during his shift. Conflicting evidence was presented on this issue. Conflicting evidence was also presented on the duration and geographic scope of the acrylonitrile fumes. We have recounted the facts to reflect Hebel's po-

completed his shift and subsequently he began to experience dizziness, nausea, headaches, difficulty breathing, an impaired sense of smell and a loss of appetite. These conditions persisted and Hebel ultimately experienced weakness in and partial loss of motor control of his legs.

Hebel sought medical care in November, 1978, and was examined by an occupational pulmonary disease specialist, Dr. Brooks. By this time, Hebel had undergone bypass surgery on his left leg and had quit working. Dr. Brooks concluded that Hebel was suffering from peripheral vascular disease, in part related to diabetes, however he also concluded Hebel was suffering a toxic reaction from his exposure to acrylonitrile. In Dr. Brooks' opinion, Hebel's exposure to acrylonitrile had aggravated and accelerated his condition.

On October 17, 1978, Hebel filed his complaint against Conrail, alleging that Conrail was negligent because: 1) it knew or should have known of the dangers attendant to the acrylonitrile spill; 2) it failed to warn him; and 3) because it failed to provide safety equipment. The complaint was filed pursuant to the Federal Employers' Liability Act (FELA) 45 U.S.C. § 51 et seq.[3] 45 U.S.C. § 51 states:

> Every common carrier by railroad while engaging in commerce between any of the several States or Territories, or between any of the States and Territories, or between the District of Columbia and any of the States or Territories, or between the District of Columbia or any of the States of Territories and any foreign nation or nations, *shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, or, in case of the death of such employee,* to his or her personal representative, for the benefit of the surviving widow or husband and children of such employee; and, if none, then of such em-

ployee's parents; and, if none, then of the next of kin dependent upon such employee, *for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.*

> Any employee of a carrier, any part of whose duties as such employee shall be the furtherance of interstate or foreign commerce; or shall, in any way directly or closely and substantial, affect such commerce as above set forth shall, for the purposes of this chapter, be considered as being employed by such carrier in such commerce and shall be considered as entitled to the benefits of this chapter.

(Emphasis added).

Conrail filed a motion in limine to prevent the plaintiff from introducing evidence it had violated regulations promulgated pursuant to the Occupational Safety and Health Act (OSHA) 29 U.S.C. § 651 et seq. The motion in limine was predicated on the argument that 29 U.S.C. § 653, as interpreted in *Bertholf v. Burlington Northern Railroad* (E.D.Wash.1975) 402 F.Supp. 171, exempted railroads from OSHA regulations.

Underlying the issue of whether OSHA regulations applied to Conrail was the issue of what impact their application would have on the plaintiff's burden of proving Conrail's negligence pursuant to the FELA. Thus, in its motion in limine, Conrail argued that under the FELA if a railroad violates a federal safety statute a "plaintiff does not have to prove that defendant was negligent". However, Conrail relied on *Bertholf, supra* and also argued that the only federal safety statutes subject to this rule are the Safety Appliance Acts, 45 U.S.C.

---

tential exposure to acrylonitrile. We want to avoid any potential misunderstanding that we are weighing the evidence, because we are not. Instead, we are viewing the evidence from a perspective which reflects the impact of the legal errors before us on the plaintiff's trial.

**3.** 45 U.S.C. § 56 gives state courts concurrent jurisdiction with the federal courts to enforce the FELA.

§ 1 *et seq.* and the Boiler Inspection Act, 45 U.S.C. § 22 *et seq.* Conrail therefore, concluded that its violation of an OSHA regulation was not a violation of a federal safety statute for purposes of determining its negligence under the FELA and for determining the plaintiff's burden of proof. Plaintiff argued that evidence of OSHA violations was proper to prove negligence even if the evidence was inadmissible to prove Conrail was strictly liable for Hebel's injuries. On appeal, plaintiff argues the evidence is proper to prove negligence per se or strict liability.

The trial court granted Conrail's motion in limine and sustained Conrail's objections to plaintiff's attempts to refer to OSHA standards at trial. Plaintiff challenges these rulings on appeal and the described issues are now before us.

■ When reviewing a negative judgment, we may only reverse the trial court's decision if it is contrary to law. *Ind. State Highway Com'n. v. Ziliak,* (1981) Ind.App., 428 N.E.2d 275; *Reynolds v. Meehan,* (1978) Ind.App. 375 N.E.2d 1119. The issues before us are legal issues; we find that the trial court erred by excluding evidence concerning Conrail's violation of OSHA regulations and therefore, the trial court's judgment is contrary to law.

■ We first note that *Bertholf, supra,* the case on which Conrail bases its argument, is not analogous to the case at bar. In *Bertholf,* the question was whether the plaintiff's contributory negligence was an issue where the defendant had violated an OSHA regulation pertaining to equipment inspections. The court was required to construe 45 U.S.C. § 53 which provides for comparative negligence under the FELA unless the defendant's violation "of any statute enacted for the safety of employees contributed to the injury or death of such employees", in which case the railroad is liable for all the plaintiff's damages. The Bertholf court interpreted this language as applying only to violations of the Safety Appliance Acts and the Boiler Inspection Act and concluded the plaintiff's contributory negligence was at issue. Further, the

court relied on Section 4(b)(4) of OSHA, 29 U.S.C. § 653(b)(4), and held that it expressly limits the applicability of OSHA to exclude the FELA. This section reads:

Nothing in this chapter shall be construed to supersede or in any manner affect any workmen's compensation law or to enlarge or diminish or affect in any other manner the common law or statutory rights, duties, or liabilities of employers and employees under any law with respect to injuries, diseases, or death of employees arising out of, or in the course of, employment.

In Hebel's case, Conrail concedes contributory negligence is not an issue. Additionally, our research leads us to conclude that the court in *Bertholf* erred in interpreting 29 U.S.C. § 653. We base our conclusion on three United States Courts of Appeals cases: *Baltimore & O.R. Co. v. O.S.H.R.C.* (D.C.Cir.1976) 548 F.2d 1052; *Southern Ry. Co. v. Occupational Saf. & H. Review Comm.* (4th Cir.1976) 539 F.2d 335; *Southern Pac. Transp. Co. v. Usery* (5th Cir.1976) 539 F.2d 386. Each case involved the issue of whether railroads were subject to OSHA regulations and whether the Secretary of Labor had authority to compel railroads to comply with OSHA regulations. These cases turned on the interpretation of section 4(b)(1) of OSHA, 29 U.S.C. § 653(b)(1) rather than 29 U.S.C. § 653(b)(4) referred to in *Bertholf.* This section reads:

(b)(1) Nothing in this chapter shall apply to working conditions of employees with respect to which other Federal agencies, and State agencies acting under section 2021 of Title 42, *exercise statutory authority* to prescribe or enforce standards or regulations affecting occupational safety or health.

(Emphasis added).

The Courts of Appeals recognized that the Department of Transportation (DOT) acting through the Federal Railroad Administration (FRA) has the authority to promulgate regulations for railroads, but held that in order for the exemption in § 653(b)(1) to apply, the FRA had to actually exercise its authority in any given area.

At the time these cases were decided, the FRA had issued an Advance Notice of Proposed Rulemaking on March 7, 1975, and after reviewing responses to it, the FRA issued another advance notice evidencing its intent to ultimately adopt a comprehensive scheme of health and safety standards for railroads. The circuit courts held actual exercise of the FRA's regulatory powers was necessary to preempt OSHA regulations. Therefore, the courts concluded the railroads were subject to OSHA regulations.

Since these cases were decided, the FRA has issued a policy statement terminating its proposed rulemaking in respect to railroad occupational health and safety standards in those areas covered by the Department of Labor regulations promulgated pursuant to OSHA. 43 Fed.Reg. 10583 (1978). Although this policy statement was issued after Hebel's exposure to acrylonitrile, it is useful for our review because despite being called a termination notice, the policy statement attempts to delineate those areas in which the FRA has exercised its regulatory authority. Our review of the various Code of Federal Regulations sections has revealed that the DOT and FRA regulations in existence do not deal, and did not deal, with air safety standards for employees in Hebel's situation. For example, 49 C.F.R. § 171–174, 179 (1981) concern the shipment of hazardous materials by rail, but they do not concern air safety standards and exposure limits. The FRA regulations which regulate air standards only apply to air contaminants in locomotive cab and caboose environments. 49 C.F.R. § 230.-229(f)(2); 49 C.F.R. § 230.259 (1981). Therefore, we conclude OSHA air safety regulations were applicable to Conrail when Hebel's claim arose.

■ Next we turn to the issue of what impact the applicability of OSHA regulations has on the plaintiff's burden of proof under the FELA. The cases in which the Courts of Appeals have interpreted OSHA and concluded that OSHA regulations were applicable to railroads, absent an actual exercise of the FRA's regulatory powers, dealt with the Secretary of Labor's power to compel railroads to comply with OSHA regulations and not with the issue of a railroad's liability to its employees under FELA for violating OSHA regulations. We have been unable to find a case dealing with this precise issue.

There are cases where courts have recognized that although OSHA does not authorize a civil cause of action against employers for violation of OSHA regulations, evidence of such violations is admissible to prove an employer's negligence, *Melerine v. Avondale Shipyards, Inc.* (5th Cir.1981) 659 F.2d 706; *Buhler v. Marriot Hotels, Inc.* (La.1974) 390 F.Supp. 999; and in fact the evidence can be used to establish negligence per se. *Rabon v. Automatic Fasteners, Inc.* (5th Cir.1982) 672 F.2d 1231; *Melerine, supra.* However, these cases and other similar cases do not involve claims filed pursuant to the FELA.

The FELA cases involving violations of safety statutes and regulations primarily deal with violations of the Safety Appliance Acts and the Boiler Inspection Act. In such cases, the courts have interpreted 45 U.S.C. § 51 as imposing an absolute duty on employers to comply with the Safety Appliance Acts and the Boiler Inspection Act despite this section's reference to "negligence".[4] *O'Donnell v. Elgin, J & E Ry. Co.,* (1949) 338 U.S. 384, 70 S.Ct. 200, 94 L.Ed. 187; *Trout v. Pennsylvania Railroad Company* (3rd Cir.1962) 300 F.2d 826; *St. Louis Southwestern Railway Company v. Williams* (5th Cir.1968) 397 F.2d 147; *Minneapolis & St. Louis Railroad Company v. Gotschall,* (1917) 244 U.S. 66, 37 S.Ct. 598, 61 L.Ed. 995; *Davis v. Wolfe,* (1923) 263 U.S. 239, 44 S.Ct. 64, 68 L.Ed. 284; *Swinson v. Chicago St. P.M. & O. Ry. Co.,* (1935) 294

---

4. There has been considerable confusion about the impact of statutory violations under the FELA and much of it has resulted from the various courts difficulty in distinguishing "negligence" from "negligence per se" and "absolute or strict liability" and initially even *res ipsa loquitor. O'Donnell v. Elgin, J & E Ry. Co., supra,* contains a good historical discussion of this point.

U.S. 529, 55 S.Ct. 517, 79 L.Ed. 1041; *Coray v. Southern Pac. Co.,* (1949) 335 U.S. 520, 69 S.Ct. 275, 93 L.Ed. 208. These cases hold that violations of these safety statutes which proximately cause an employee's injury are the basis for the employer's liability without regard to negligence and without regard to whether the employee's activity was originally and specifically the object of the safety statute.

This concept was taken one step further in *Kernan v. American Dredging Company,* (1958) 355 U.S. 426, 78 S.Ct. 394, 2 L.Ed.2d 382, where the Supreme Court held that absolute liability imposed on a federal employer by the FELA for violation of a statutory duty is not limited to violations of the Safety Appliance Acts and the Boiler Inspection Act, but instead that the rule applies anytime an employer violates a statutory duty and the violation is the proximate cause of an employee's injuries.

*Kernan* involved a claim filed by a seaman's estate pursuant to the Jones Act, 46 U.S.C. § 688, a statute which creates a federal wrongful death action for seamen against employers. The Jones Act incorporates the FELA by reference and the Court relied on cases interpreting the FELA in reaching its decision. The defendant had violated a Coast Guard regulation setting minimum height requirements for navigational lights. As a result of the violation, a low hanging kerosene lamp ignited oil floating on a river and the fire killed a seaman. Although the regulation was intended to aid navigation and not to protect working seamen, the Court found the defendant liable. In response to the defendant's assertion that absolute liability applied only to violations of the Safety Appliance Acts and the Boiler Inspection Act, the Court stated:

> It must therefore be concluded that *the nature of the Acts violated is not a controlling consideration; the basis of liability is the FELA.*

The courts, in developing the FELA with a view to adjusting equitably between the worker and his corporate employer the risks inherent in the railroad industry, have plainly rejected many of the refined distinctions necessary in common-law tort doctrine for the purpose of allocating risks between persons who are more nearly on an equal footing as to financial capacity and ability to avoid the hazards involved. Among the refinements developed by the common law for the purpose of limiting the risk of liability arising from wrongful conduct is the rule that violation of a statutory duty creates liability only when the statute was intended to protect those in the position of the plaintiff from the type of injury in fact incurred. This limiting approach has long been discarded from the FELA. *Instead, the theory of the FELA is that where the employer's conduct falls short of the high standard required of him by this Act, and his fault, in whole or in part, causes injury, liability ensues. And this result follows whether the fault is a violation of a statutory duty or the more, general duty of acting with care, for the employer owes the employee, as much as the duty of acting with care, the duty of complying with his statutory obligations.*

(Emphasis added.)

355 U.S. at 438–439, 78 S.Ct. at 401.

Given such a broad basis for absolute liability under the FELA with defendants being held liable both for violations of occupational safety statutes, where the harm in question was not the within original focus of the statute, and for violations of statutes which were not occupational safety statutes, we think it is clear that absolute or strict liability applies to violations of OSHA regulations related to claims under the FELA.

■ Given this background, the trial court committed reversible error by excluding evidence of OSHA regulations and their violations by Conrail. The OSHA regulation pertaining to acrylonitrile in effect in February, 1977 was 29 C.F.R. § 1910.1000 [5] which in relevant part stated:

---

5. Current standards found at 29 C.F.R. § 1910.-1045 (1981), which became effective January

16, 1978, substantially lowered the permissible

(2) Other materials-8-hour time weighted averages. An employee's exposure to any material in table Z–1, the name of which is not preceded by "C", in any 8-hour work shift of a 40-hour work week, shall not exceed the 8-hour time weighted average given for that material in the table.

. . . . .

Table Z–1

| Substance | p.p.m.[2] | mg/M[3b] |
| --- | --- | --- |
| Acrylonitrile | Skin 20 | 45 |

The evidence presented indicated Hebel was exposed to levels in excess of the 20 p.p.m. specified in Table Z–1. For example, evidence indicated acrylonitrile cannot be smelled until concentration exceeds 22 p.p.m. and various persons testified they could smell acrylonitrile on the day Hebel was present at the spill site. Testimony indicated that the various reactions resulting from exposure at the spill site were indicative of a concentration of acrylonitrile in excess of 20 p.p.m. Dr. Brooks thought Hebel's symptoms resulted from "acute exposure" to acrylonitrile. Clearly the plaintiff was harmed by exclusion of the OSHA evidence.

Plaintiff raises another issue which involves reversible error; he challenges the trial court's decision to admit medical records pertaining to periodic physical examinations which Hebel was required to undergo by Conrail. The records were admitted on the basis that they fell within the "business records" exception to the hearsay rule, over plaintiff's objection.

Conrail's medical secretary, Toth, testified she was responsible for keeping records of Conrail employees' medical examinations for the Columbus-Cincinnati division. This division included Dearborn County where Hebel lived. Toth explained that standard forms were used and that they were designed for the employees to fill out the top half of the form, which asked if the employees had experienced various physical symptoms such as dizziness, blurred vision or nausea, since their last physical. Hebel's records indicate negative answers to these various questions. His examinations were done by various doctors outside Conrail's office. The completed forms were sent to Toth. Toth stated she was not sure who filled out Hebel's forms, although they were designed to have their top half completed by the employee and the bottom half completed by the physician. She conceded procedures varied among various doctors.

The business records exception to the hearsay rule was summarized in *American United Life Insurance Company v. Peffley* (1973) 158 Ind.App. 29, 301 N.E.2d 651.

A synthesis of the Indiana cases treating what modern authorities call the "business record" exception to the hearsay rule is that documentary evidence is admissible if identified by its entrant or one under whose supervision it is kept and shown to be an original or first permanent entry, made in the routine course of business, at or near the time of the recorded transaction, by one having both a duty to so record and personal knowledge of the transaction represented by the entry. (Citations omitted).

301 N.E.2d 656.

■■■ This rule has been clarified and it now is clear that a custodian of business records may identify them at trial. *Burger Man, Inc. v. Jordan Paper Products, Inc.,* (1976) 170 Ind.App. 295, 352 N.E.2d 821; *State Ex Rel., Etc. v. Estate of Stephens,* (1981) Ind.App., 426 N.E.2d 116; *Piwowar v. Washington Lumber & Coal Co.,* (1980) Ind.App., 405 N.E.2d 576. However, the

concentration levels for occupational exposures to acrylonitrile. Relevant sections provide:

(c) *Permissible exposure limits. (1) Inhalation. (i) Time weighted average limit (TWA).* The employer shall assure that no employee is exposed to an airborne concentration of acrylonitrile in excess of two (2) parts acrylonitrile per million parts of air (2 ppm) as an eight (8)-hour time-weighted average.

(ii) *Ceiling limit.* The employer shall assure that no employee is exposed to an airborne concentration of acrylonitrile in excess of ten (10) ppm as averaged over any fifteen (15)-minute period during the work day.

(2) *Dermal and eye exposure.* The employer shall assure that no employee is exposed to skin contact or eye contact with liquid AN. (Original emphasis).

person making the record must be under the direct supervision and control of the supervisor identifying the documents and must have personal knowledge of the events represented in them. *Burger Man, Inc., supra; Estate of Stephens, supra; Piwowar, supra.* In the case at bar, the various doctors, their staffs, and Hebel were not under Toth's direct supervision and control. Indeed, she was unsure who made the records. Therefore, it was error to admit the documents.

Judgment reversed and cause remanded for further action consistent with this opinion.

NEAL, J., concurs.

RATLIFF, J., concurs in result with opinion.

RATLIFF, Judge, concurring in result.

Liability under the Federal Employers' Liability Act generally is predicated upon negligence on the part of the carrier subject to the provisions of the act. 32 Am.Jur.2d *Federal Employers' Liability, Etc.* § 26 (1982). However, violation of certain statutory safety requirements have been held to give rise to liability on the part of the carrier without a showing of negligence. *Id.* § 33. In other words, the obligations of these statutory safety requirements are absolute and, consequently, form the basis for strict liability for violations. *Id.,* § 34. Specifically, violations of the Safety Appliance Acts and the Boiler Inspection Act have been held to give rise to such strict liability. *Id.,* §§ 33–40. The majority here would extend the strict liability concept to violations of OSHA regulations. In the absence of agreement by the authorities as to whether violations of administrative regulations are negligence per se or merely evidence of negligence, *see* 57 Am.Jur.2d *Negligence* §§ 271–73, I am unable to join in making such violations the basis of the imposition of strict liability. However, since such violations are at least evidence of negligence, if not negligence per se, it was error to exclude evidence of such OSHA regulations and the violations thereof.

Therefore, I concur in the result reached in this case.