Robert HEBEL, personal representative
for Richard C. Hebel, Deceased,
Appellant (Plaintiff Below),

v.

CONRAIL, INC., Appellee
(Defendant Below).

No. 385S81.

Supreme Court of Indiana.

March 14, 1985.

Douglas C. Holland, Lawrenceburg, for appellant.

John F. Stroup, Lawrenceburg, Nicholas C. Nizamoff, White & Raub, Indianapolis, for appellee.

ON CIVIL PETITION TO TRANSFER

PRENTICE, Justice.

The evidence favorable to the judgment of the trial court is as follows:

On February 22, 1977, at approximately 6:00 a.m., a boxcar in Defendant's (Conrail) freight train heading east toward Guilford, Indiana, derailed approximately one-half mile west of Guilford, punching a hole in the lower east end of a tank car behind it containing 35,000 gallons of acrylonitrile, a hazardous chemical used in the manufacture of plastics. The derailed boxcar and punctured tank car came to rest approximately 1800 feet west of a parking lot on the outskirts of Guilford, adjacent to the railroad tracks. The tank car contents flowed east on the north side of the railroad tracks, then south through a culvert (located 1100 feet west of the parking lot) under the tracks to Tanners Creek; by 9:00 a.m., the tank car was almost empty.

At approximately 7:00 a.m., the train crew notified Conrail's train dispatcher in Indianapolis of the derailment. Shortly thereafter, pursuant to Conrail procedure, Conrail's Indianapolis supervisor of train operation notified Chemtrek, the Bureau of Explosives, State Board of Health and the Environmental Protection Agency concerning this chemical spill.

Around 9:00 a.m., in response to the Lawrenceburg trainmaster's phone call, 3 representatives of the tank car owner, Monsanto, arrived in Guilford and proceeded to the derailment site. Monsanto's senior representative, the safety superintendent of the Addyston, Ohio plant, after observing the derailment site and tank car from as close as 5 feet, experienced no discomfort from any chemical fumes and did not feel that it was necessary to wear air packs or self-contained breathing apparatus.

At about 11:00 a.m., 3 members of the Indiana State Board of Health Emergency Response Team arrived in Guilford and began monitoring the air for the presence of acrylonitrile vapors. Air sample readings taken by the Emergency Response Team members from the parking lot to the tank car did not indicate the presence of acrylonitrile vapors until 20 feet east of the tank car, and readings taken over water and chemical filled ditches between the railroad cars and the culvert under the tracks also failed to indicate the presence of chemical vapors. Based upon their findings, the team was of the opinion there was no acrylonitrile vapor problem and did not recommend, nor feel it necessary under the circumstances to use self-contained breathing apparatus.

The operations officer of the hazardous materials company hired by Conrail to clean up the derailment spill was also of the opinion that masks or self-contained breathing apparatus were not necessary nor needed.

During the afternoon of February 22, the entire train, except for the derailed boxcar, was removed from the Guilford area; by 8:00 p.m., the remaining boxcar had been rerailed and also removed from the area.

The next day, February 23, Plaintiff's decedent, Richard C. Hebel (Hebel), who was a Conrail policeman, was assigned to work at the Guilford derailment site beginning at 4:00 p.m. that day and ending at 4:00 a.m. on February 24. At 4:10 p.m. on February 23 in the parking lot, Hebel asked the Lawrenceburg trainmaster if he (Hebel) needed to go down there and he (trainmaster) said he didn't see any reason why Hebel would have to do down to the derailment site. During Hebel's tour of duty, he was seen only at the parking lot

on the outskirts of Guilford, 1800 feet east of the actual derailment site. At the end of his shift at 4:00 a.m. on February 24, Hebel called his supervisor and related that the scene was reasonably secure, that there hadn't been any trespassers there, and that in his judgment, it didn't warrant another officer's coming down and relieving him. Hebel did not sound unusual nor did he make any complaint about how he was feeling.

During February 23 and 24 and while Hebel was on duty at the parking lot, there were no persons overcome by the chemical vapors; there were no chemical odors in the parking lot; there was no chemical liquid east of the culvert, and the closest vapor concentration was west of the culvert, which was 1100 feet west of the parking lot. Three people, including two bulldozer operators working at the site of the spill, had been overcome by the fumes and taken to the hospital on the 22nd, following approximately twelve hours of working in the immediate area of the chemical. Conrail did have knowledge of these casualties.

Although Hebel later told his doctor he was off work at least a few days after the "acute incident" ending at 4:00 a.m. on February 24, he missed no work until March 19 when he was off work one day. After that, Hebel worked for the remainder of 1977 missing work only on April 23 and October 25–26 due to sickness. On May 17, 1977, Hebel took his annual physical examination required by Conrail and acknowledged to the examining physician that he had had no medical complaint or problems since his last previous examination on May 24, 1976.

Although Conrail's primary safety rule was that all personal injuries be immediately reported by the employee to his supervisor, Hebel's supervisor was not notified or aware that Hebel was claiming injury as a result of an alleged chemical exposure on February 23–24, 1977, until the supervisor read about the filing of Hebel's suit in October, 1978. In the 1½ year period between the Guilford derailment and the filing of his suit, Hebel never informed his supervisor that he was claiming injury as the result of an exposure at the derailment site.

On November 1, 1978, after he filed suit, Hebel gave a history of his alleged chemical exposure to Dr. Brooks, as follows: he was guarding an overturned tank car which contained acrylonitrile; he had to stay there and guard that car; he noted a brownish fog-like emission emitting from around the tank car and was in very close proximity to the car. Based upon what Hebel told him, it was Dr. Brook's opinion that Hebel's underlying peripheral vascular disease was aggravated by the alleged acrylonitrile exposure which accelerated his death, in November, 1979. The doctor also testified, on cross-examination, that it was possible that the progression of Hebel's peripheral vascular disease in 1978 and 1979 could have occurred as it did without exposure to acrylonitrile. Defense witness, Dr. Thomas Bright, a physician and toxicologist, testified that the symptoms reported by Hebel to his doctor were inconsistent with a typical exposure to acrylonitrile. It was also Dr. Bright's opinion that the progression of Hebel's peripheral vascular disease in 1978 to his death in 1979 was not unusually rapid, but was a classic case of the disease of a diabetic smoker, not connected with exposure to the chemical.

This action was brought initially by Hebel on October 12, 1978, in Dearborn Circuit Court under the Federal Employer's Liability Act (FELA), 45 U.S.C. § 51 et seq. Hebel died on November 7, 1979; and on June 30, 1980, Plaintiff, Robert Hebel, as personal representative for Hebel, was substituted as party plaintiff.

Trial by jury resulted in judgment for the Defendant and against the Plaintiff. The Plaintiff appealed and the Indiana Court of Appeals, First District, reversed. *Hebel v. Conrail, Inc.*, (1983) Ind.App., 444 N.E.2d 870 (*reh'g denied* March 1, 1983). The case is now before us on a Petition to Transfer filed by Conrail on March 21, 1983.

Also on March 21, 1983, twelve railroad companies operating within the State of

Indiana filed their joint motion for leave to file Brief Amici Curiae in support of Conrail's petition to transfer, which motion was sustained and said brief ordered filed August 3, 1983. On August 8, 1983, the cause was argued orally both on the Petition to Transfer and the merits and taken under advisement.

■ We have been greatly hampered in our review of this case by reason of Plaintiff's inarticulate briefing and the assignment of numerous alleged errors which, if committed, were, nevertheless, not preserved for review. We address assigned issues V and IV because of our desire to reach the merits of appeals wherever it appears that justiciable issues exist and because these issues were addressed in detail by the Court of Appeals and, in our judgment, decided erroneously.

### ISSUE V—STRICT LIABILITY CLAIM

With regard to this claim, Plaintiff, in his "Statement Of The Issues Presented For Review," assigns: "Whether the Trial Court erred in not allowing into evidence, violations of federal safety statutes." In his "Summary of the Argument," Plaintiff charges not that evidence of violations was rejected but rather that the trial court did not allow him "to present the federal safety standard [relative to the presence of] acrylonitrile in the workplace into evidence"—a charge differing from the one set forth in the statement of issues.

In his argument, Plaintiff launches into a syllogism that the OSHA standards were for the protection of workers in the workplace, including him, that the violation of such regulations was negligence *per se* under the Federal Employer's Liability Act, and that the trial court erred in directing a verdict upon that issue. This was the thesis of the Court of Appeals; thus, although it appears to us that because of procedural

deficiencies, namely that we cannot determine from Plaintiff's brief, or the record, the provisions of the regulations that Defendant allegedly violated, the issue is not before us. Apparently, the Court of Appeals took the burden of making this determination upon itself—an admirable effort to do justice but perhaps one it can ill afford to extend and certainly one beyond the call of its duty.

■ Transfer is now granted under Appellate Rule 11(B)(2)(b) inasmuch as the Court of Appeals erroneously decided a new question of law in holding that a violation of Occupational Safety and Health Act (OSHA) regulations was admissible as evidence of negligence *per se*, thus imposing strict or absolute liability in FELA actions,[1] and said decision and opinion of the Court of Appeals is ordered vacated.

The decision herein, upon this issue, is controlled by the following quoted provision of the Act under which the regulation allegedly violated was adopted:

*"Nothing in this chapter shall be construed to supersede or in any manner affect any workmen's compensation law or to enlarge or diminish or affect in any other manner the common law or statutory rights, duties, or liabilities of employers and employees under any law with respect to injuries, diseases, or death of employees arising out of, or in the course of, employment." 29 U.S.C. § 653(b)(4)* (Emphasis added.)

The legislative history accompanying OSHA also reflects the proscriptions set forth above.

*"The bill does not affect any Federal or state workmen's compensation laws, or the rights, duties, or liabilities of employers and employees under them. In addition, it does not modify other Federal laws prescribing safety and health standards. The bill does not authorize the*

---

**1.** There has been considerable confusion about the impact of statutory violations under the FELA and much of it has resulted from the various courts' difficulty in distinguishing "negligence" from "negligence per se" and "Absolute or strict liability" and initially even *res ipsa*

*loquitor. O'Donnell v. Elgin, J & E Ry. Co.,* (1949) 338 U.S. 384, 70 S.Ct. 200, 94 L.Ed. 187, contains a good historical discussion of this point.

Also on this subject, *see* 57 Am.Jur.2d *Negligence* § 235.

Secretary of Labor to assert authority under this bill over particular working conditions regarding which another Federal agency exercises statutory authority to prescribe or enforce standards affecting occupational safety and health." (1970 *U.S.Code Cong. and Adm.News*, 5177, 5199) (Emphasis added.)

This issue was addressed in *Wendland v. Ridgefield Const. Services, Inc.*, (1981) 184 Ct. 173, 439 A.2d 954, 956, as follows:

"We proceed, then, to determine whether the plaintiff, having established a violation of a regulation, was entitled to a jury instruction on negligence per se. Neither party has briefed this issue. Nevertheless, we must address it because to ignore it would be to ignore a clear, plain statutory directive. General Statutes § 31–369(b) provides that '[n]othing in this chapter shall be construed to supersede or in any manner affect any workers' compensation law or to enlarge, diminish or affect in any manner common law or statutory rights, duties, or liabilities of employers or employees, under any law with respect to injuries, diseases or death of employees arising out of and in the course of employment.' Federal law contains a similar provision. 29 U.S.C. § 653(b)(4). [Footnote omitted]. Both statutes refer to the Occupational Safety and Health Act, which is the enabling legislation for the safety regulations at issue in this case. Thus we must decide whether the negligence per se instruction given to the jury in this case is legally correct when measured against these limiting statutes.

\* \* \* \* \* \*

"A negligence per se instruction transforms the character of the factfinder's inquiry. The applicable standard of care is affected by such an instruction. Because the standard of care is the key factor in determining liability, we conclude that the application of a negligence per se instruction affects common law rights, duties and liabilities of employers and employees with respect to injuries of employees arising out of and in the course of employment as those terms are used in 29 U.S.C. § 653(b)(4) and General Statutes § 31–369(b). Thus, the negligence per se instruction was erroneous."

In *Bertholf v. Burlington Northern Railroad*, 402 F.Supp. 171 (E.D.Wash. 1975), a FELA action, the employee sought summary judgment where a defect in a hoist was the proximate cause of the accident, and violation of an OSHA regulation requiring regular inspections of such equipment was charged. The court held:

"Further, plaintiff's argument would fail for the additional reason that section 4(b)(4) of OSHA, 29 U.S.C. § 653, upon which plaintiff relies to find an employer violation of a safety statute, expressly limits the operation of OSHA regulations to render them inapplicable to FELA cases:

'Nothing in this chapter shall be construed to supersede or in any manner affect any workmen's compensation law or to enlarge or diminish or affect in any other manner the common law or statutory rights, duties, or liabilities of employers and employees under any law with respect to injuries, diseases, or death of employees arising out of, or in the course of, employment.'"

402 F.Supp. at 173.

Another holding is *National Marine Service, Inc. v. Gulf Oil Co.*, 433 F.Supp. 913, (E.D.La.1977) *aff'd.*, 608 F.2d 522 (5th Cir.1979). An action brought under the Jones Act, 41 Stat. 1007, 46 U.S.C. § 688, rendering FELA applicable to seamen. An issue was whether OSHA regulations were applicable to crew members, and it was held that the specific wording of the Jones Act excluded them. The court continued, "Even if there was a violation of OSHA regulations, that violation may not be used to create civil liability, 29 U.S.C.A. § 653(b)(4), although the regulations may be used as guides for the determination of standards of care[.]" (Citations omitted.) 433 F.Supp. at 919.

Hebel relies upon *Kernan v. American Dredging Co.*, (1958) 355 U.S. 426, 78 S.Ct. 394, 2 L.Ed.2d 382 for his proposition that

under FELA the violation of a safety regulation gave rise to absolute liability in the employer for injuries to the employee proximately caused thereby. *Kernan* appears to be analogous to the case before us only in that it arose under the Jones Act and the injury resulted from the violation of a Coast Guard Regulation. There, the similarities end. The issue was whether strict liability would arise from the violation of a regulation designed for a purpose other than to protect against injuries of the nature of the resultant one. The regulation required navigational lights on ships to be at a minimum height of eight feet above the water. Its purpose was to maximize visibility by others, as a guard against collision. A seaman lost his life on a tugboat when an open-flame kerosene lamp on board a scow being towed ignited inflammable vapors lying above an accumulation of petroleum spread over the surface of the water. The lamp was approximately three feet above the water's surface rather than at the height established by the Coast Guard Regulation. Following a line of FELA cases, wherein strict liability had been imposed for violation of the Safety Appliance Act and the Boiler Inspection Act, notwithstanding that the injuries had not been of the type the regulations had been intended to prevent, the Supreme Court, in a 5–4 decision, held, upon an evolving public policy of shifting the "human overhead" of the "inevitable deaths and injuries of industrial employment" from workers to industry, that the purpose of the regulation was not relevant.

Clearly the distinguishing factor in *Kernan* is the absence of the OSHA provision, above quoted, proscribing any construction "to enlarge or diminish or *affect* ... common law or statutory rights, duties, or liabilities of employers and employees under any law."

We have found no case where absolute liability has been imposed for violation of an OSHA regulation against a claim that the express language of OSHA prohibits the creation of liability.

## ISSUE V—ORDINARY NEGLIGENCE CLAIM

The trial court directed a verdict for the Defendant upon the question of strict liability but permitted the case to go to the jury upon the issue of negligence, and the jury returned a verdict for Defendant upon that issue. Although it appears to us that Plaintiff has sought review of the rejection of OSHA standards only as it affected his claim of strict liability, two statements from his argument might be viewed as presenting a claim that the standards were admissible as evidence of negligence, even if not as evidence of negligence *per se;* and Judge Ratliff, in a brief opinion concurring in the result of the decision of the Court of Appeals, agreed that the standards were admissible in evidence for that purpose. We express no opinion in that matter. The OSHA standards do not appear to be in the record. We, therefore, do not know the level of concentration of the chemical that they permit before reasonable care requires exposure precautions to be taken. Neither has Plaintiff informed us of the levels of concentration actually present at the time of the alleged exposure. It therefore appears to us that to find error upon this question would require us to speculate upon both the provisions of the Standards and upon the concentration of acrylonitrile present.

## ISSUE IV

The Court of Appeals also held that the admission into evidence of Defendant's Exhibit I was reversible error, a holding with which we also disagree. The exhibit consisted of medical reports relative to Hebel taken from Defendant's file and reflective of Hebel's physical condition from 1957 through May 17, 1977. We are thwarted in our review of this issue by an inadequate statement of the grounds for the objection; and, indeed, the Defendant claims that error, if any, in the admission of the exhibit was waived for want of an objection disclosing the legal principle upon which it was premised. From our review of the record, however, it does appear that the

Defendant proffered the exhibits under the business records exception to the hearsay rule, and we accept, *arguendo,* the Plaintiff's objection: "We will just make our objection that [the witness identifying the exhibit] does not know who prepared the forms" as a sufficient objection. We are also of the opinion that the foundation laid did not meet the "business record exception" requirements of *Wells v. State,* (1970) 254 Ind. 608, 261 N.E.2d 865, in that the circumstances of preparation of some of the records comprising the exhibit were not such as would assure their reliability. Rather, they were simply documents filed among the Defendant's records in the ordinary course of its business. The trial court did err if it admitted the entire exhibit upon the premise that its entire contents qualified under the exception.

We are also handicapped by Plaintiff's failure to advise us in argument of how the admission of the exhibit harmed him, other than as follows:

"The Plaintiff was irreparably damaged as the jury was given the physical reports without the Plaintiff (sic) having an opportunity of placing Dr. Todd or the other doctors under oath to explain the basis of the reports under cross-examination." (Appellant's Brief p. 34.)

Defendant replied to this argument as follows:

"[T]he exhibit did impeach the credibility of the Hebels since they contended Richard Hebel was in excellent health before February 23, 1977, and poor health thereafter." (Appellee's Brief p. 21.)

And Plaintiff responded:

"The parties are in agreement that the admission of Exhibit 'I' is of such a decisive nature in this case [Appellee Brief p. 21] that the improper admission of this exhibit requires reversal." (Appellant's Reply Brief p. 19.)

In *Gilmore v. State,* we stated:

"Appellant's original brief should not only present the issues to be decided upon appeal, but it should be of material assistance to the court in deciding those issues. It is insufficient to merely state that a requested instruction, which has been denied, correctly states the law and that certain other instructions were insufficient to cover the points contained in the refused instruction. This court is entitled to have presented to it in more than summary fashion the reasons why the action of the trial court has prejudiced the appellant."

*Gilmore v. State,* (1951) 229 Ind. 359, 367, 98 N.E.2d 677, 681.

 Before one is entitled to a reversal, he must affirmatively show that there was error prejudicial to his substantial rights. This court, on review will not search the record to find grounds for reversal. *Akins v. State,* (1981) Ind., 429 N.E.2d 232, 236.

The theory of Plaintiff's case was not that Hebel was in excellent health prior to the chemical exposure. Rather, it was that he was suffering from various health problems, significantly diabetes, hypertension and arteriosclerosis which had been severely aggravated by the exposure and that his worsening condition, accelerated bypass surgery and ultimate death had been the proximate result of the exposure.

Dr. Brooks, Plaintiff's medical witness, testified concerning the classic symptoms of acrylonitrile exposure. "The symptoms of the nausea, vomiting, headache, decreased appetite, perhaps even the shortness of breath, are the classical symptoms of acrylonitrile toxicity." (R. at 303.)

He also testified as to Hebel's statements to him made during his examination had on November 1, 1978, which were that he had been exposed to the chemical and that he developed the aforementioned symptoms almost immediately thereafter.

"He then after twelve hours or so, finished his work and he developed symptoms of a stuffy nose and he noted a decrease in his appetite. He then developed nausea—that is, feeling sick to his stomach. He developed a headache and he developed shortness of breath. He then returned home and after returning

home he also—and this was the symptoms that I initially related: nausea, shortness of breath and headache, were right at the end of his work shift while he was still at work place. He went home and he developed nausea and vomiting, headache continued, stuffy nose continued, the shortness of breath got worse, he developed some wheezing but not much cough. He had no fever. The symptoms continued the next day and he was particularly short of breath when he exerted himself, such as climbing the stairs. He continued to have a headache and then for the first time, he noted pain in his calves. Now, over the next few weeks his appetite decreased, the shortness of breath—or the decreased appetite continue, the shortness of breath continued, he was still short of breath with exertion, and the pain in his legs and the headache and the weakness and dizziness continued. The symptoms persisted then over the next few months and he noted not only the pain in his legs but the weakness and having difficulty controlling his legs and occasionally he would fall. He stated to me that his legs felt like he was stepping into a hole. He had no actual control. His appetite continued to be poor and he noted a decrease in his sexual functions." (R. pp. 301, 302.)

Hebel's widow and son also testified as to Hebel's having suffered and exhibited many of the aforementioned symptoms beginning immediately following his exposure.

Our review of the exhibit in question reveals but one document that could have been damaging to Plaintiff's case—the record of Hebel's routine physical examination report by a Dr. Todd made on May 17, 1977, which was but three months following the acrylonitrile exposure.

The report forms, including the one of May 17, 1977, are in two parts. The upper portion of the page identifies the examinee and presents twenty-seven questions to be answered by him "yes" or "no" by making a check mark. *That portion of the form bears the signature of the examinee, in this case, Hebel.* All responses on that form were in the negative, and among those questions were the following:

"Since your last examination," (May 24, 1976) do you know of any physical or mental condition which might restrict your ability to work? Have you had:

Any illnesses, operations or injuries?
Fainting or dizziness?
Shortness of breath or cough?
Trouble with digestion or bowels?
Numbness, weakness or paralysis?
Weakness or fatigue?
Trouble with hip or knee?
Stiff, swollen or painful joints or muscles?

The aforementioned statements of Hebel were relevant to his physical condition at critical times and to the credibility and weight of the testimony of his widow and son and of Dr. Brooks. They were admissible as the admissions of a decedent against his personal representative.[2] *Eckert, Admr. v. Triplett,* (1874) 48 Ind. 174; *Slade v. Leonard, Admr.,* (1881) 75 Ind. 171, *Uebelhack Equipment, Inc. v. Garrett Brothers, Inc.,* (1980) Ind.App., 408 N.E.2d 136, 138. *See 31A C.J.S. Evidence § 322. Because the portion of the records signed by Hebel were admissible, albeit for a reason other than the one argued by Defendant, and because we find nothing harmful to Plaintiff in the portions of*

---

**2.** "But it is undoubtedly more desirable to accept the traditional distinctions, adopted by Wigmore, and to draw the line clearly between the two exceptions. Under this view, the admissions of a party-opponent come in without satisfying any of the requirements for declarations against interest. The admissions need not have been against interest when made, though it will usually happen that they were. The party making the admission need not be, and seldom is, unavailable. Nor does the party making the admission need to have had personal knowledge of the fact admitted. Accordingly, when the admission of a party, or a party's predecessor in interest, is sought to be introduced, it should be offered as and tested by the requirements for parties' admissions, not those for declarations against interest." (footnotes omitted). McCormick on Evidence § 276 (1972).

*the exhibit that were hearsay and should have been rejected, we find no reversible error upon this issue.*

*Other issues,* as assigned by Plaintiff's brief in his "Statement of the Issues Presented for Review" and not considered by the Court of Appeals, are as follows:

"(1) Whether the Trial Court erred in instructing the jury;

(2) Whether the Trial Court erred in sending all the exhibits and instructions with the jury during deliberations;

(3) Whether Plaintiff was denied a fair trial due to violations of the Indiana Trial Rules regarding discovery;

\* \* \* \* \* \*

(6) Whether the Trial Court erred in not allowing the October 16, 1981 deposition of Dr. Brooks and ruling prior to a hearing;

(7) Whether the Trial Court erred in not allowing Plaintiff to take the rebuttal deposition of Dr. Brooks;

(8) Whether the misbehavior of Defendant by Defendant's counsel deprived Plaintiff of a fair trial; and

(9) Whether the verdict is contrary to the evidence."

### ISSUES I, VI, VII

Issues I, VI and VII have been inadequately briefed and will not be considered. Appellate Rule 8.3(A)(7)

*Issue I* claims error in the refusal of the trial court to give four of Plaintiff's tendered final instructions. However, his brief does not present us with a sufficient statement of the evidence and supporting citations to the record to enable us, with reasonable effort and diligence upon our part, to comprehend the context in which the instructions were tendered. Rather, as urged by Defendant, Plaintiff has merely presented us with a copy of the instructions, a general statement of the theory of the case, statements of general legal principles and his version of the evidence, without citations to the record. Appellate Rule 8.3 requires Appellant arguments to contain those parts of the record that support

his contentions and a clear showing of how the issues and the contentions supporting them relate to the particular facts of the case. Without such assistance we are unable to determine whether an omitted instruction was required under the evidence or whether harm was likely to have resulted to the complaining party.

*Issue VI* claims error in the trial court's ruling quashing the deposition of witness Brooks taken a few days before trial upon but six hours notice to Defendant and in "not allowing Plaintiff to retake this deposition at any other time[,]" (Plaintiff's Brief p. 40) in response to his motion made during trial labeled "Motion for Leave to Supplement" which motion he avers was denied. (Plaintiff's Reply Brief p. 22.) This witness' deposition had been taken many months previously and was published and read into evidence at the trial. Apparently Plaintiff, at a very late date, wished to depose the witness further. Not only do we find no error in the court's ruling and alleged ruling upon these issues, but Plaintiff has again made no attempt to show how he was harmed. There has been no showing of what he proposed to present by additional testimony from the witness. To provide the basis for reversal, excluded testimony must appear in the record. This is done by making an offer to prove. *Gurley v. State,* (1976) 264 Ind. 552, 557, 348 N.E.2d 16, 20; *Chatman v. State,* (1975) 263 Ind. 531, 538; 334 N.E.2d 673, 678.

We also note a self contradiction in regard to this question. Although Plaintiff argues at page 40 of his brief that "The Plaintiff was greatly prejudiced by the Court's act," on the preceding page he argued that the desired additional testimony was "just to clarify some peripherial points." (Plaintiff's Brief p. 39.)

Regarding *Issue VII,* on another occasion during trial, Plaintiff gave notice to Defendant for an additional deposition of Plaintiff's witness Brooks. This proposed deposition was labeled a "rebuttal deposition," and apparently was for the purpose of rebutting testimony given by defense

witness Bright. The trial court, on Defendant's motion, quashed the notice. Again, we need not address the issue, as Plaintiff has made no showing of harm.

## ISSUES II, III, VIII

Issues II, III and VIII cannot be considered, because error, if any, was not preserved by appropriate action in the trial court.

■■■ By *Issue II*, Plaintiff assigns error in the court's having sent the exhibits and instructions with the jury when it retired for deliberations. However, the record reveals no objection to such action having been made at the trial; hence such action is not available for review. Presentation of this assignment, for the first time, by way of the motion to correct errors was not timely. *Taylor v. State*, (1973) 260 Ind. 264, 278, 295 N.E.2d 600, 608–609, *cert. denied*, 414 U.S. 1012, 94 S.Ct. 377, 38 L.Ed.2d 250; *Gosnell v. State*, (1978) 268 Ind. 429, 431, 376 N.E.2d 471, 472; *McMinoway v. State*, (1973) 260 Ind. 241, 245, 294 N.E.2d 803, 805; *Barnes v. State*, (1971) 255 Ind. 674, 675, 266 N.E.2d 617, 618.

■■■ By *Issue III*, error has been assigned in that the court permitted Defense Witness Kirk to testify over Plaintiff's objection that the witness' name had not been included upon Defendant's list of witnesses provided in response to discovery. The witness was Vice President for Operations of O.H. Materials, Inc., the company which had been employed by Defendant to clean up the site following the chemical spill. Two and one-half years prior to trial, Defendant responded to Plaintiff's request for a list of witnesses and listed, among many others, "Employees and Officers of O.H. Materials, Inc., Findley, Ohio." Plaintiff made no request for more particular information regarding the identity of such employees and officers, made no claim of surprise and requested no continuance. We see no error in permitting the witness to testify under such circumstances.

Plaintiff also seeks reversal by reason of Defendant's failure to comply with a tardy request for Defendant to produce certain documents upon which defense witness Bright's testimony would be predicated. Apparently the request was made but two weeks prior to trial and no motion was made to shorten the 30-day response period as anticipated by Trial Rule 34(B). Additionally, no in-trial motion was addressed to the Defendant's failure to comply. He proceeded to allow Bright's testimony, without objection, and to cross-examine him, without protest. *See Chustak v. N. Ind. Pub. Serv. Co.*, (1972) 259 Ind. 390, 394, 288 N.E.2d 149, 152.

With regard to both of the above mentioned claims of error, it can again be noted that Plaintiff has made no showing of how he was harmed. *Akins v. State*, 429 N.E.2d at 236.

## ISSUE IX

■■■ Under this assignment, Plaintiff challenges the verdict as being contrary to the evidence under Trial Rule 59(A)(4). As pointed out by Defendant, however, he is appealing from a negative judgment, and such an assignment presents nothing for review on appeal. Considering the assignment as a charge that the judgment is contrary to law, we immediately note that the evidence was in conflict with regard to Defendant's alleged negligence, the alleged causal relation between Plaintiff's exposure to the toxic chemical and his death, and even as to whether he suffered such exposure. Plaintiff had the burden of proof.

■■■ This Court will reverse a negative verdict, as being contrary to law, only when the evidence is without conflict and leads to but one conclusion and the trial court reached an opposite conclusion. *Warren v. State*, (1963) 243 Ind. 508, 517, 188 N.E.2d 108, 112; *State ex rel., Flaugher v. Rogers*, (1948) 226 Ind. 32, 37, 77 N.E.2d 594, 596; *State v. Smithers*, (1971) 256 Ind. 512, 519, 269 N.E.2d 874, 878. Also, see *Bailey v. Kain*, (1963) 135 Ind. App. 657, 192 N.E.2d 486 (transfer denied)

and 4 Harvey and Townsend Indiana Practice 135 regarding the difference in the positions of the trial court and the appellate court with respect to motions addressed to the correctness of the verdict under the evidence.

By his Reply Brief, Plaintiff has attempted to shift his position upon this issue in his effort to persuade us to reweigh the evidence, citing cases wherein we have acknowledged that a consideration of weight and credibility by the reviewing court is sometimes necessary to a proper determination of whether error that has been found was likely to have harmed the appellant. *Miller v. State,* (1982) Ind., 436 N.E.2d 1113 and cases there cited. However, this is not such a case.

We find no reversible error. The judgment of the trial court is affirmed.

GIVAN, C.J., and HUNTER and PIVARNIK, JJ., concur.

DeBRULER, J., dissents with opinion.

DeBRULER, Justice, dissenting.

The requirement of an offer of proof is often based upon the need to specifically identify the material excluded by the court's ruling, and to provide a basis for appellate evaluations of the harm from erroneous exclusion to substantial rights. *Marposon v. State* (1972), 259 Ind. 426, 287 N.E.2d 857. Here, as is not uncommon, appellee does not contend in its answer brief that there was no compliance with the requirement of an offer of proof, and thus the appellate court is unwittingly drawn into an in-depth research of the merits of the issue only to find at some point in the investigation, often after considerable expenditure of time and effort, that no offer of proof was made. In such situations the parties on appeal are satisfied with the identification of the excluded evidence to be found in the record. When such a situation occurs, and the appellate tribunal does determine, through an accurate and rational process akin to judicial notice, the exact nature of that which would have been in the omitted offer of proof, as the Court of

Appeals did in this case, such appellate tribunal should be accorded the discretion to then go ahead and make a proper resolution of the issue on its merits on the basis of that determination. I see no good reason not to permit that to be done, particularly where the appellee felt no impingement from the lack of an offer. And I certainly see no good reason for this court on transfer to nullify a court of appeals opinion which went so far as to actually and accurately identify the absent proof. On the merits of the ruling, I agree with Judge Ratliff, that the OSHA regulations regarding exposure levels for acrylonitrile, were admissible as evidence of negligence and that it was error to exclude evidence of them and their violation by the defendants.

I likewise cannot agree with the majority opinion wherein it places a burden on the plaintiff below to show exact levels of concentration of dangerous molecules in the air at the precise time of exposure. That is an impossible burden and entirely unrealistic. That requirement would limit recovery to situations where constant monitoring of the workplace was taking place at the time of exposure. That seldom occurs, even in a spill case. The best that is ordinarily available is circumstantial evidence of levels shown by periodic sampling, and the senses of smell and sight and taste of persons in the workplace.

Furthermore, I cannot agree that Issue I cannot be considered because of inadequate briefing. The plaintiff's rejected instructions are set out verbatim; their purpose is described; their legal sources are given; and the harm from the court's rulings is demonstrated in light of the record. The briefing is well within tolerable limits.

While there is more than negligible support for the proposition that the issues were fairly tried and resolved, I am persuaded to vote for a new trial to permit the OSHA regulations to have their sway with the trier of fact. There is some indication in this record that industry standards were no less stringent than the standards in the OSHA regulations.