539 F.2d 335
 3 O.S.H. Cas.(BNA) 1940, 1975-1976 O.S.H.D. ( 20,414
 SOUTHERN RAILWAY COMPANY, Petitioner,
v.
OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION and Peter
J. Brennan, Secretary of Labor, United States
Department of Labor, Respondents,
AFL-CIO and United Transportation Union, Intervenors.
 No. 75-1055.
 United States Court of Appeals,
Fourth Circuit.
 Argued July 10, 1975.
Decided Feb. 9, 1976.
 
 Charles A. Horsky, Washington, D. C. (Jeffrey S. Berlin, Covington & Burling, Washington, D. C., Edgar A. Neely, Jr., Richard K. Hines, Neely, Freeman & Hawkins, Atlanta, Ga., and William P. Stallsmith, Jr., Washington, D. C., on brief), for petitioner.
 William M. Moloney, John B. Norton, John F. Kay, Jr., Mays, Valentine, Davenport & Moore, Richmond, Va., on brief, for amicus curiae Ass'n of American Railroads.
 Benjamin W. Mintz, Associate Solicitor for Occupational Safety and Health, U. S. Dept. of Labor, Washington, D. C. (William J. Kilberg, Solicitor of Labor, Michael H. Levin, Counsel for Appellate Litigation, Allen H. Feldman, Asst. Counsel for Appellate Litigation, and Dennis K. Kade, Atty., U. S. Dept. of Justice, Washington, D. C., on brief), for respondents.
 Lawrence M. Mann, Washington, D. C. (Bernstein, Alper, Schoene & Friedman, Washington, D. C., on brief), for intervenors.
 Before CRAVEN, BUTZNER and FIELD, Circuit Judges.
 FIELD, Circuit Judge:
 
 
 1
 This case is before the court upon a petition for review of a final order of the Occupational Safety and Health Review Commission (Commission) entered November 26, 1974, against Southern Railway Company (Southern). This court has jurisdiction under Section 11(a) of the Occupational Safety and Health Act of 1970 (OSHA/Act).[1]
 
 
 2
 The facts are undisputed. The petitioner, Southern, a Virginia corporation, operates an interstate common carrier railroad system which includes a facility for maintenance and repair of rolling stock known as the Hayne Shop in Spartanburg, South Carolina. In October of 1973, an OSHA compliance officer made a routine inspection of the facility pursuant to 29 U.S.C. § 657(a), and on November 2, 1973, the Secretary of Labor (Secretary) cited Southern for ten "non-serious" violations of standards promulgated by the Secretary under the authority of OSHA, proposing certain penalties and requiring abatement of the alleged violations by April of 1974. The citations were affirmed by an administrative law judge and his decision was upheld by a split Commission.[2]
 
 
 3
 Southern admits that it has not complied with the OSHA standards and regulations alleged to have been violated, but takes the position that it is exempt from compliance by Section 4(b)(1) of the Act[3] which reads in pertinent part as follows:
 
 
 4
 "Nothing in this chapter shall apply to working conditions of employees with respect to which other Federal agencies, * * * exercise statutory authority to prescribe or enforce standards or regulations affecting occupational safety or health."
 
 
 5
 Southern contends that the exemption is operative because the Secretary of Transportation, acting through the Federal Railroad Administration (FRA), has exercised his authority pursuant to the Federal Railway Safety Act of 1970, 45 U.S.C. § 421, et seq., and earlier railway safety acts[4] to promulgate and enforce safety regulations affecting the working conditions of railway employees. Conceding that FRA has not exercised its authority to regulate employee safety in railway shop and repair facilities such as the Hayne Shop, Southern urges that, nonetheless, there has been a sufficient exercise of the regulatory authority to exempt the working conditions of all employees in the railway industry from the OSHA standards. The Secretary admits that under the Federal Safety Act the FRA has authority to regulate all areas[5] of employee safety for the railway industry, but contends that Section 4(b)(1) exempts only those areas of railway employee safety in which FRA has expressly exercised its authority. The Commission, in essence, adopted the Secretary's view.[6]
 
 
 6
 While Section 4(b)(1) may not be entirely self-defining, it is clear that the exemption applies only when another Federal agency has actually exercised its statutory authority. It does not apply where such an agency has regulatory authority but has failed to exercise it. This is clear not only from the statutory language but from the legislative history as well. Earlier versions of the legislation had provided that the mere existence of statutory authority in another Federal agency was sufficient to invoke the exemption, but they were rejected by the Congress. See Legislative History of the Occupational Safety and Health Act of 1970, pp. 62, 620, 671, 710 (Committee Print, 1971) (Legislative History).[7] That actual exercise of the statutory authority rather than its mere existence was contemplated is clearly evident from the following colloquy during debate on the Act in the House of Representatives:
 
 
 7
 "MR. ERLENBORN.
 
 
 8
 If there is authority under the Federal law, but it has (not) yet been put into effect and it is not being exercised by the executive agency because they have no rules or regulations, then until they do adopt rules and regulations and exercise that authority then this does apply; is that correct?
 
 
 9
 MR. DANIELS of New Jersey. Yes, that would be correct. The gentleman has placed his finger on the key word and the key word is 'exercise.'
 
 
 10
 If an agency fails to pursue the law and exercise the authority that has been given to it, then this law will step in.
 
 
 11
 MR. ERLENBORN. In other words, the mere existence of statutory authority does not exempt an industry? It is the exercise of that authority pursuant to the statute that does exempt it; is that correct?
 
 
 12
 MR. DANIELS of New Jersey. That is correct."
 
 
 13
 Legislative History, p. 1019.
 
 
 14
 With respect to Southern's argument that the exercise of authority by the FRA in substantial areas of employee safety exempted the entire industry from OSHA standards, the specific statutory language is less clear. Both the Secretary and Southern have referred us to the Legislative History as providing support for their respective positions, but we find nothing definitive bearing upon the question before us.[8]
 
 
 15
 In addition to his references to the Legislative History, the Secretary urges that the Commission's construction of the statute should be virtually dispositive. In advancing this argument he places primary reliance upon Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965), where the Court stated:
 
 
 16
 "When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration. 'To sustain the Commission's application of this statutory term, we need not find that its construction is the only reasonable one or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings.' * * * 'Particularly is this respect due when the administrative practice at stake " involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion; of making the parts work efficiently and smoothly while they are yet untried and new." ' " (Citations omitted).
 
 
 17
 This principle of Udall was recognized by us in Brennan v. Gilles & Cotting, Inc., 504 F.2d 1255 (4 Cir. 1974), where we accepted the Commission's definition of the term "employer" as used in Section 5(a) of the Act.[9] Noting that alternative definitions were equally consistent with the objectives of the Act, we stated: "It follows that since Congress has chosen the Occupational Safety and Health Review Commission as the enforcing agency, the choice between these alternatives is appropriately committed to it." Id., at 1261. We observed that deference to the Commission's construction was appropriate not only because of its expertise but because "Congress intended that this agency would have the normal complement of adjudicatory powers possessed by traditional administrative agencies." Id., at 1262.
 
 
 18
 While it is true that Gilles & Cotting was addressed to the "day to day economic realities" of OSHA's implementation rather than the bald question of statutory construction which presently confronts us, its rationale is highly persuasive and, in itself, might well tip the scale in favor of the Secretary's position. However, we find it unnecessary to rely upon either the sparse legislative history relative to Section 4(b)(1) or the Commission's interpretation, for in our opinion a fair reading of the exemptive provision in the light of the statutory objectives requires that the Commission's construction of the statute be affirmed.
 
 
 19
 OSHA was enacted in response to an appalling record of death and disability in our industrial environment, and it was the clear intendment of Congress to meet the problem with broad and, hopefully, effective legislation. The declared purpose of the Act was "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources." 29 U.S.C. § 651(b). "Since the statute does not, on its face, provide an answer to the specific question (before us) * * * reference to the statutory purpose behind the Act is especially necessary to arrive at an interpretation of the statute consistent with the objectives Congress sought to achieve through this legislation."[10] Additionally, the scope of the Congressional objective requires that this "(r)emedial social legislation * * * be construed liberally in favor of the workers whom it was designed to protect, and any exemption from its terms must be narrowly construed."[11] Accordingly, the exemptive statute should appropriately be construed to achieve the maximum protection for the industrial workers of the Nation.
 
 
 20
 In our opinion the industry-wide exemption urged upon us by Southern would fly in the face of these principles and objectives. The safety regulations of the Department of Transportation are confined almost exclusively to those areas of the railway industry which affect over-the-road operations such as locomotives, rolling stock, signal installations, road beds and related facilities.[12] While the regulatory program in these areas reflects a concern for the safety of the employees, it is directed primarily toward the general safety of transportation operations. On the other hand, the Department of Transportation and FRA do not purport to regulate the occupational health and safety aspects of railroad offices or shop and repair facilities. To read the exemptive statute in a manner which would leave thousands of workers in these non-operational areas of the railway industry exposed to unregulated industrial hazards would, in our opinion, utterly frustrate the legislative purpose.
 
 
 21
 Southern suggests that a rejection of its position will, of necessity, constitute an acceptance on our part of the "nook and cranny theory of safety regulation"[13] under which the Secretary's jurisdiction would extend into every minute detail of the working environment not covered by a specific standard or regulation of the other Federal agency. While some intra-agency memoranda[14] indicate that the Secretary of Labor has espoused such a theory, the decisions of the Commission have evinced a somewhat ambivalent attitude on the question.[15] In any event, we do not think our choice of alternatives is as limited as Southern would suggest.
 
 
 22
 The crux of the controversy is the phrase "working conditions" in Section 4(b)(1). The Secretary contends that this phrase means "particular, discrete hazards" encountered by an employee in the course of his job activities.[16] Southern, on the other hand, insists that the term means "the aggregate of circumstances of the employment relationship that is, the employment itself."[17]
 
 
 23
 We think both of the parties are a bit wide of the mark. Southern and the Secretary each relies upon Corning Glass Works v. Brennan, 417 U.S. 188, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974), where the Court, in considering the meaning of the term "working conditions" as used in the Equal Pay Act of 1963,[18] stated:
 
 
 24
 " * * * the element of working conditions encompasses two subfactors: 'surroundings' and 'hazards.' 'Surroundings' measures the elements, such as toxic chemicals or fumes, regularly encountered by a worker, their intensity, and their frequency. 'Hazards' takes into account the physical hazards regularly encountered, their frequency, and the severity of injury they can cause. This definition of 'working conditions' is * * * well accepted across a wide range of American industry." (Footnotes omitted) Id., at 202, 94 S.Ct. at 2232.
 
 
 25
 We think this aggregate of "surroundings" and "hazards" contemplates an area broader in its contours than the "particular, discrete hazards" advanced by the Secretary, but something less than the employment relationship in its entirety advocated by Southern. The Act was intended both to provide comprehensive coverage to the workers across the country and to avoid duplication of regulatory effort by the various Federal agencies. In the light of these dual objectives, and drawing upon the Corning definition, we are of the opinion that the term "working conditions" as used in Section 4(b)(1) means the environmental area in which an employee customarily goes about his daily tasks. We are further of the opinion that when an agency has exercised its statutory authority to prescribe standards affecting occupational safety or health for such an area,[19] the authority of the Secretary of Labor in that area is foreclosed. Such a construction, we think avoids the confusion and duplication of effort that Section 4(b)(1) of the Act was designed to prevent, and is consonant with the general statutory purpose.
 
 
 26
 One further point requires our attention. Following the Commission's decision in this case, the FRA on March 3, 1975, issued an Advance Notice of Proposed Rule Making,[20] which Southern asserts was an exercise of statutory authority sufficient, in itself, to trigger the exemption under Section 4(b) (1). Aside from the question of whether such an advance notice constitutes rule making under the Administrative Procedure Act, 5 U.S.C. § 551(5),[21] it appears to us that the areas of the railway industry to be covered by the proposed rules will be confined to those which are the subject of regulations presently in effect.[22] Exclusion of a substantial number of employees from coverage is recognized by a specific disclaimer in the notice:
 
 
 27
 "Even though FRA has broad authority to regulate railroad occupational safety and health, it does not now propose to adopt railroad occupational safety standards for all railroad working conditions or work places. FRA will adopt, as necessary, standards regarding occupational safety and health conditions of railroad employees whose work place or activities are related to the operation of the rail transportation system."
 
 
 28
 40 Fed.Reg. 10693 (March 7, 1975).
 
 
 29
 We agree with the Secretary that the denial of OSHA's protection to numerous workers upon the basis of this speculative announcement would be inappropriate.
 
 
 30
 For the reasons stated herein the Commission's order is affirmed.
 
 
 31
 AFFIRMED.
 
 
 
 [1]
 84 Stat. 1590, 29 U.S.C. § 651, et seq
 
 
 [2]
 Secretary of Labor v. Southern Railway Company, OSHRC Docket No. 5566 (November 26, 1974)
 
 
 [3]
 29 U.S.C. § 653(b)(1)
 
 
 [4]
 Some of the Acts of Congress relied upon by Southern are:
 The Safety Appliance Acts, 45 U.S.C. §§ 1-14. The Signal Inspection Act, 45 U.S.C. § 26. Train, Brakes Safety Appliance Act, 45 U.S.C. § 9. Hours of Service Act, 45 U.S.C. § 61, et seq. Rail Passenger Safety Act, 45 U.S.C. § 502, et seq.
 
 
 [5]
 45 U.S.C. § 431(a) reads in part:
 "The Secretary of Transportation * * * shall (1) prescribe, as necessary, appropriate rules, regulations, orders, and standards for all areas of railroad safety supplementing provisions of law and regulations in effect on October 16, 1970, and (2) conduct, as necessary, research, development, testing, evaluation, and training for all areas of railroad safety."
 
 
 [6]
 The Commission majority rejected Southern's contention for an industry-wide exemption based upon its decision in the case of Secretary of Labor v. Southern Pacific Transportation Company, OSHRC Docket No. 1348, 2 OSHC 1313 (1974), pending on review sub nom., Southern Trans. Co. v. OSHRC and Brennan (CA5, Nos. 74-3981 and 75-1091)
 
 
 [7]
 The language of H.R. 13373 (Ayres Bill) is representative:
 "Nothing in this Act shall authorize the * * * Secretary to regulate, or shall apply to working conditions of employees with respect to whom other Federal agencies, * * * have statutory authority to prescribe or enforce standards or regulations affecting occupational safety or health. (Emphasis added).
 Legislative History, p. 710.
 
 
 [8]
 See, e. g., Legislative History at 162, 997, 1223; cf., pp. 1019, 1020, 1037
 
 
 [9]
 29 U.S.C. § 654(a)
 
 
 [10]
 Brennan v. Gilles & Cotting, Inc., 504 F.2d 1255, 1260 (4 Cir. 1974)
 
 
 [11]
 Wirtz v. Ti Ti Peat Humus Company, 373 F.2d 209, 212 (4 Cir. 1967)
 
 
 [12]
 Southern appears to concede that the railway safety statutes referred to in footnote 4, supra, are directed solely to the transportation operations of the industry
 
 
 [13]
 This phrase was used by Chairman Moran in his dissenting opinion in Secretary of Labor v. Southern Pacific Transportation Company, n.6, supra
 
 
 [14]
 See, e. g., Memorandum of the General Counsel for the Department of Transportation re: "Interpretation of section 4(b)(1) of the Occupational Safety and Health Act of 1970." Occupational Safety & Health Reporter, Vol. 4, No. 35 (January 30, 1975), pp. 1072-74. (Bureau of National Affairs, Inc.)
 
 
 [15]
 See Secretary v. Mushroom Transportation Co., Inc., OSAHRC Docket No. 1588, 5 OSAHRC Rep. 64 (1973). Cf. Secretary v. Fineberg Packing Co., Inc., OSAHRC Docket No. 61, 7 OSAHRC Rep. 405 (1974)
 
 
 [16]
 Secretary's Brief, p. 18
 
 
 [17]
 Petitioner's Brief, p. 9
 
 
 [18]
 29 U.S.C. § 206(d)(1)
 
 
 [19]
 Under OSHA the term "standard" is defined as follows:
 "(8) The term 'occupational safety and health standard' means a standard which requires conditions, or the adoption or use of one or more practices, means, methods, operations, or processes, reasonably necessary or appropriate to provide safe or healthful employment and places of employment." 29 U.S.C. § 652.
 The Commission however, has recognized that "Section 4(b)(1) does not require that another agency exercise its authority in the same manner or in an equally stringent manner." Secretary v. Mushroom Transportation Co., Inc., n. 15, supra, at 67.
 
 
 [20]
 40 Fed.Reg. 10693 (March 7, 1975)
 
 
 [21]
 See Secretary v. Chesapeake & Ohio Railway Co., OSHRC Docket No. 10334, 1974-75, OSHD P 19,581 (CCH)
 
 
 [22]
 "The working conditions and work places to be covered by the railroad occupational safety and health standards refer to the specific areas of the railroad industry which will be covered by regulations in the interest of safety and which directly affect railroad transportation operations. Areas covered will include rail roadways, rolling stock, yards and terminals and repair and maintenance facilities located on or adjacent to the roadway, yards and terminals. The proposed regulations would supplement the existing FRA safety regulations." 40 Fed.Reg. 10693, n. 20, supra