Michael PRATICO, Plaintiff, Appellant,

v.

PORTLAND TERMINAL COMPANY,
Defendant, Appellee.

No. 85–1196.

United States Court of Appeals,
First Circuit.

Argued Aug. 8, 1985.

Decided Dec. 4, 1985.

Maurice A. Libner with whom McTeague, Higbee, Libner, Reitman, MacAdam & Case, Brunswick, Me., were on brief, for plaintiff, appellant.

Ralph I. Lancaster, Jr. with whom Kevin F. Gordon and Pierce, Atwood, Scribner, Allen, Smith & Lancaster, Portland, Me., were on brief, for defendant, appellee.

Before CAMPBELL, Chief Judge, BOWNES and TORRUELLA, Circuit Judges.

BOWNES, Circuit Judge.

This appeal raises some novel questions of law concerning the interaction of safety regulations promulgated under the Occupational Health and Safety Act (OSHA), 29 U.S.C. §§ 651 et seq. (1982), and the Federal Employers' Liability Act (FELA), 45 U.S.C. §§ 51 et seq. (1982). Plaintiff-appellant, Michael Pratico, brought suit against

his employer, Portland Terminal Company, under FELA for damages suffered when he was injured in a railroad yard accident. He claimed below that his injury was caused by the railroad's use of equipment in violation of OSHA regulations and that this constituted negligence per se. He also claimed that under FELA a violation by the employer of a safety statute which leads to an injury eliminates the employer's defense of contributory negligence. 45 U.S.C. § 53. The district court found that there was no relevant OSHA regulation, struck previously admitted testimony concerning the regulation from the record, and refused to give plaintiff's requested jury instruction on negligence and contributory negligence. The court further stated that, even if there had been an OSHA violation, it would have found the requested jury instruction an incorrect statement of the law. The jury returned a verdict for the plaintiff in the amount of $227,000, but found him to have been 80% contributorily negligent; his award was, therefore, reduced to $45,000. Appellant claims that both of the court's rulings were in error and that he is entitled to the full amount of the damages awarded, with prejudgment interest, or, at the very least, a new trial.

The accident which forms the basis for plaintiff's FELA suit took place while he and two other men were involved in a routine maintenance operation called "changing the brasses." Between the journal (axle) and wheels on every railroad car is a device called the journal box containing bronze bearings (brasses), lubrication pads, and oil, all of which have to be periodically inspected and changed. In order to do this the journal box must be lifted several inches off the journal. The first step is to raise one end of the railroad car with a large hydraulic jack so as to take the weight of the car off the journal. Next, any accumulated grease and oil is scraped off the journal box and a jack is placed underneath it to lift the journal box off the journal. Between two and three thousand pounds of force is required to lift a journal box. When the box is lifted, oil from the lubricating pads invariably flows out of the journal box and onto the jack and the immediate work area. A worker then probes inside the raised journal box with a pair of two- or three-foot-long tongs to remove, inspect and replace worn brasses and lubricating pads. The journal box is then lowered back onto the journal. This procedure must be repeated eight times for each car.

The tool ordinarily used by the railroad industry to lift the journal box off the journal is a "journal jack," a small, light-weight mechanical jack which has been in use since the early 1900's. One commonly used model introduced into evidence at the trial required about eight or nine pounds of effort to lift one ton and had a carrying capacity of fifteen tons. The operation of the journal jack is quite similar to that of an ordinary tire jack supplied with automobiles. The body of the jack is placed under the journal box and an operating lever is inserted. The lever is moved up and down until the box is raised to the appropriate height. The presence of a self-locking ratchet in the jack makes it unnecessary for the operator to maintain continuous pressure on the operating lever in order to keep the journal box raised. The journal jack introduced into evidence at trial had a metallic label attached to it which read:

| WARNING: DO NOT | WHEN OPERATING JACK DO |
|---|---|
| 1. Overload Jack<br>2. Lift People or Loads over People<br>3. Operate Damaged or Malfunctioning Jack<br>4. Use Levers Longer Than Specified<br>5. Apply Off Center Loads<br>6. Alter Original Equipment<br>7. Remove or Obscure This Label | 1. Support the Jack Securely to Prevent Slipping Out from Under Load<br>2. Follow the Load with Cribbing or Blocking<br>3. Read the Manufacturer's Instructions and ANSIB 30.1 Safety Code for Jacks |

While the Portland Terminal Company did own journal jacks, it also used another device for lifting the journal box which was manufactured by it especially for this purpose. It was a lever and fulcrum device consisting of a bent metal pipe about ten and one-half feet long and a metal fulcrum with a flat metal baseplate placed approximately six to ten inches from the lifting end. Expert testimony estimated that this device provided a ten to one mechanical advantage, meaning that 200 pounds of

force would be necessary to raise one ton. A small metal rod was welded over one of the bends in the pipe for strength and reached from about the four-foot mark across the fulcrum to the short, lifting end of the lever. A short horizontal rod was welded to the lifting end of the pipe forming a "T" that cradled the journal box.

Lever Device

In order to change the brasses, the short T end of the lever was inserted under the journal box, one or two workers would push down on the long end of the lever with the weight of their bodies and while the journal box was raised another worker would pull out the brasses. The pushers would frequently straddle the lever to hold it down while their partner was probing in the journal box for the brasses, a period of thirty to forty seconds. Testimony indicated that no one was ever told not to straddle the lever while it was engaged with the journal box. There was also testimony to the effect that the journal box was never cribbed, blocked, or supported by anything other than the lever while it was in the raised position. Once the brasses were removed, weight would be taken off the lever, and the journal box lowered while the brasses were inspected. When it came time to replace the brasses, the T was once again engaged, the journal box raised, the brasses inserted and then the journal box lowered to its original position.

At the time of the accident, the plaintiff and a fellow worker were engaged in using this lever device to change the brasses. The two of them tried to lift the journal box by pushing down on the lever, but were unable to do so. They enlisted the help of another and heavier worker. Plaintiff's partner, who was the smallest of the three, switched to the job of pulling out the brasses. Plaintiff and the third person succeeded in raising the journal box. Plaintiff then straddled and sat on the end of the lever while his partner was probing in the journal box. No blocking or cribbing was used to support the raised journal box; it was kept raised solely by the weight of the plaintiff on the lever. While plaintiff was straddling the lever, the raised journal box unexpectedly came down, forcing the pushing end of the lever up and catapulting plaintiff into the air. He landed across the lever on his lower back and is now permanently disabled.

I. *The Applicability of The OSHA Regulations*

We first consider the district court's ruling that the OSHA safety regulations pertaining to jacks, 29 C.F.R. §§ 1910.241(d)(1) & 1910.244(a), were not applicable to the lever device used by the plaintiff at the

time of the accident. The OSHA regulations pertaining to jacks are as follows:

### § 1910.241 Definitions.

. . . .

(d) *Jack terms* —(1) *Jack.* A jack is an appliance for lifting and lowering or moving horizontally a load by application of a pushing force.

Note: Jacks may be of the following types: Lever and ratchet, screw and hydraulic.

(2) *Rating.* The rating of a jack is the maximum working load for which it is designed to lift safely that load throughout its specified amount of travel.

Note: To raise the rated load of a jack, the point of application of the load, the applied force, and the length of lever arm should be those designated by the manufacturer for the particular jack considered.

. . . .

### § 1910.244. Other portable tools and equipment.

(a) *Jacks* —(1) *Loading and marking.*

(i) The operator shall make sure that the jack used has a rating sufficient to lift and sustain the load.

(ii) The rated load shall be legibly and permanently marked in a prominent location on the jack by casting, stamping, or other suitable means.

(2) *Operation and maintenance.*

(i) In the absence of a firm foundation, the base of the jack shall be blocked. If there is a possibility of slippage of the cap, a block shall be placed in between the cap and the load.

(ii) The operator shall watch the stop indicator, which shall be kept clean, in order to determine the limit of travel. The indicated limit shall not be overrun.

(iii) After the load has been raised, it shall be cribbed, blocked, or otherwise secured at once.

(iv) Hydraulic jacks exposed to freezing temperatures shall be supplied with an adequate antifreeze liquid.

(v) All jacks shall be properly lubricated at regular intervals.

(vi) Each jack shall be thoroughly inspected at times which depend upon the service conditions. Inspections shall be not less frequent than the following:

(a) For constant or intermittent use at one locality, once every 6 months,

(b) For jacks sent out of shop for special work, when sent out and when returned.

(c) For a jack subjected to abnormal load or shock, immediately before and immediately thereafter.

(vii) Repair or replacement parts shall be examined for possible defects.

(viii) Jacks which are out of order shall be tagged accordingly, and shall not be used until repairs are made.

While the district court found that the definition of a jack set out in § 1910.241(d)(1) was broad enough to include the lever device, it focused upon the Note which followed as a possible limitation of the scope of the definition: "Jacks may be of the following types: Lever and ratchet, screw and hydraulic."

Three interpretations of this Note were put before the court: a nonexclusive exemplar list of *some* types of jacks; a regulatory limit on the kinds of jacks which are permitted; or a definitional limit on what will be considered a jack. The court ruled that the Note was to be read as a definitional limitation. This ruling appears to have been based upon two factors. First, it had already determined that the lever device was not covered by the 1981 American National Standards Institute (ANSI) Safety Code for Jacks, B30.1, and refused to admit the Code into evidence. Although the 1981 ANSI Code definition of a jack was broad enough to cover the lever device,[1] the scope of the Code's coverage was specifically limited to "general purpose, portable jacks of the following categories: hand- or power-operated hydraulic jacks,

---

1. Section 1–.0.2 *"jack.* A portable hand or power operated mechanism with a base and load point designed for controlled linear movement."

mechanical ratchet jacks, and hand- or power-operated mechanical screw jacks. Second, the court noted that some of the safety rules found in § 1910:244(a) could not apply to the lever device, such as the requirement that the operator watch the "stop indicator" so that the limit is not overrun, § 1910.244(a)(2)(iii), and the requirement that all jacks be properly lubricated at regular intervals, § 1910.-244(a)(2)(v). Recognizing the ambiguity of the Note, the district court "cut the Gordian knot" (its words) and decided that it was to be read as a definitional limitation. The court then ruled that since the lever device did not have a ratchet, it was not a jack under the OSHA definition and the safety regulations did not apply to its use.

       It is admittedly difficult to discern the scope of this OSHA regulations on jacks from the ambiguous language of the Note.[2] We begin with what appears to be common ground, that the lever device, an appliance designed and used to lift and lower a load by the application of a pushing force, fits very nicely under the definition found in § 1910.241(d)(1). Furthermore, it is not as absurd to consider a lever and fulcrum device a "jack" as was suggested by defense counsel. The Oxford English Dictionary offers as one definition of the word "jack": "10. A machine, usually portable, for lifting heavy weights by force acting from below; in the commonest form, having a rack and a pinion wheel or screw

and a handle turned by hand." Under this definition, however, we find the following quotation illustrating, among others, the usage of the word: "1886 ELWORTHY *W. Somerset Word-bk., Jack,* a contrivance consisting of a lever and fulcrum, used in washing carriages, to lift one side so that the wheel ... may run round freely; sometimes called a 'carriage-jack.'" The lever and fulcrum device may not be the most common form of a jack, but it does appear to be a kind of jack nonetheless.

    Regardless of common usage, however, we must determine whether the framers of this regulation meant to include this kind of device under the safety regulations governing the use of jacks. Certainly it would appear to be within the protective purpose of the regulation to require that a lever and fulcrum device, when used in place of a more common type of jack and subjecting workers to the same kind of dangers encountered when using any other jack, be subject to the same safety regulations, in particular the one requiring that the load be blocked or cribbed once it is raised.

    While we cannot turn to any official legislative history to aid us in determining the specific intent of those who framed this regulation, we do have available some helpful material. The OSHA regulations were derived from a Safety Code for Jacks promulgated by the American National Standards Institute. ANSI first published this Code in 1943, substantially revised it in

---

**2.** Our brother, in his dissent, argues that where there is such ambiguity in a safety regulation, we should construe it narrowly. Whatever the merit of this approach in other contexts, it is not appropriate in a FELA action. FELA was enacted by Congress to provide a remedy for injured railroad workers which was more generous than that provided by the common law. The law was enacted because Congress recognized that the railroad industry, although crucial to the economic life of the country, was also an inordinately dangerous place for workers. One aspect of this plaintiff-oriented statute was that where an injury was the result of a violation by the railroad of a safety statute, an injured worker's damage award could not be reduced by a showing that the worker had been contributorily negligent. Over the years, this provision has been liberally enforced by the courts. *See Kernan v. American Dredging Co.,*

355 U.S. 426, 78 S.Ct. 394, 2 L.Ed.2d 382 (1958) (summarizing cases). In a FELA case where contributory negligence may be present, full recovery by the injured worker is dependent upon a showing that a safety statute was violated. If we were to follow the approach of the dissent, injured workers would be denied this opportunity whenever an OSHA regulation is ambiguous, which will often be the case, and unconstrued by the Secretary of Labor, which is also not infrequent. The forum contemplated by FELA was a federal court and not an administrative agency. We must not shirk the responsibility of interpreting these regulations; however difficult, it is one of our regular judicial tasks. There is no unfairness to the railroad in this approach. It has an opportunity to argue that the regulation does not apply. It is in no way deprived of a forum. All we have done is assure the injured worker the same opportunity.

1975 and made further minor revisions in 1981. The OSHA jack regulations were promulgated prior to the 1975 revision[3] and are based upon the 1943 ANSI Code.[4] In fact, every provision found in the OSHA regulations is a word-for-word copy of provisions in the 1943 ANSI Code, although not everything found in the 1943 ANSI Code was incorporated into the OSHA regulations. The 1943 ANSI Code, therefore, provides a context for the ambiguous Note which it is our job to interpret.

Preceding the definition of a jack and the Note incorporated into the OSHA regulations as § 1910.241(d), the 1943 ANSI Code contained the following provisions:

101 Scope

This code applies to the construction and use of all portable manually operated jacks except those which are supplied with automobiles as part of their standard tool equipment.

102 Purpose, Interpretation, and Exceptions

The purpose of this code is to provide reasonable safety for persons and property. It is intended to serve as a guide to manufacturers, users, insurance carriers, and regulatory authorities, and to be suitable for adoption by the latter.

The requirements of this code are the minimum compatible with reasonable safety and are not intended to constitute a design specification. Exceptions to the literal requirements may be granted by the enforcing authority, or alternatives permitted if it is clearly evident that reasonable safety is thus secured.

The scope of the 1943 ANSI Code includes all portable manually operated jacks except consumer automobile jacks. Putting this together with the broad definition of a jack as "an appliance for lifting and lowering or moving horizontally a load by application of a pushing force," the lever device appears to fall within the scope of the Code if the Note is not read as a limit on the definition but as a nonexclusive illustration of possible types of jacks.

A comparison of the 1943 ANSI Code with the 1975 and 1981 versions suggests that the Note was meant only as an illustration. There are no drawings in the 1943 version. On the other hand, neither the 1975 nor the 1981 versions contain the Note but, instead, contain a set of figures illustrating "typical Jacks covered by this Standard. They are not intended to be all inclusive." The illustrations are of manual and power screw jacks, ratchet jacks and hydraulic jacks. When the authors of the 1975 and 1981 versions of the ANSI Code decided to make specific limitations upon the kinds of jacks to be covered by the safety code, they put a limit in the "scope" section: "B30.1 applies to general purpose, portable jacks of the following categories: hand- or power-operated hydraulic jacks, mechanical ratchet jacks, and hand- or power-operated mechanical screw jacks." 1981 ANSI Safety Code on Jacks, B30.1 § 1–0.1. It, therefore, appears to us that from its broad scope the 1943 version of the ANSI Code was not intended to be as limited in its coverage as the 1975 and 1981 versions.

We also note that section 102 of the 1943 version on the interpretation of the requirements indicates that the code requirements are not design specifications. Thus we think the district court erred in placing so much significance on the fact that some of the regulations refer to design features, such as a "stop indicator," which the lever device does not have.

OSHA is a remedial statute, 29 U.S.C. § 651, and "remedial statutes are to be liberally construed in favor of their beneficiaries." *Irvington Moore v. Occupational Safety and Health Review Comm'n,* 556 F.2d 431, 435 (9th Cir.1977). It would be anomalous to allow the railroad to evade the strictures of OSHA by the use of a primitive lifting device with no safety features whatsoever while enforcing the OSHA regulations when more sophisticated and safer devices are used. We conclude, therefore, that both the spirit and the letter

---

**3.** 36 F.R. 10466 (1971).

**4.** 29 C.F.R. § 1910.246.

of the OSHA regulations are followed by viewing the lever device used by the Portland Terminal Company as a jack subject to OSHA's safety requirements.

## II. *OSHA and The Railroads*

■ We now turn to the district court's striking of the OSHA testimony and denial of plaintiff's jury instruction on negligence and contributory negligence. Before we address plaintiff's arguments concerning negligence per se and contributory negligence, however, we must consider another preliminary matter: whether OSHA regulations apply to the railroad industry at all. Section 4(b)(1) of OSHA states:

> Nothing in this chapter shall apply to working conditions of employees with respect to which other federal agencies, and State agencies acting under section 2021 of Title 42, exercise statutory authority to prescribe or enforce standards or regulations affecting occupational safety or health.

29 U.S.C. § 653(b)(1). Under the Federal Railroad Safety Act of 1970, 45 U.S.C. § 421 *et seq.*, the Secretary of Transportation, acting through the Federal Railroad Administration (FRA), has authority to promulgate and enforce safety regulations affecting the working conditions of railroad employees. This authority has resulted in the promulgation of regulations in 49 C.F.R. §§ 200–68. A review of these regulations reveals that, although the inspection of the brasses was itself required by regulation, 49 C.F.R. §§ 215.107—113, there are no regulations covering the procedure and equipment to be used.

The question before us, then, is whether *any* exercise of regulatory authority is sufficient to exempt the railroad industry from coverage by OSHA or whether only an actual exercise of authority in a particular area will exempt that area from OSHA coverage. This court has previously ruled that "OSHA's authority to regulate a given working condition ... is foreclosed only insofar as another agency has exercised its authority to regulate that working condition. Thus, in order for the exemption to apply it must be shown that another agency has exercised its authority to regulate the 'working condition' involved here...." *PBR, Inc. v. Secretary of Labor*, 643 F.2d 890, 896 (1st Cir.1981). *See also Donovan v. Red Star Marine Services, Inc.*, 739 F.2d 774, 778 (2d Cir.1984), *cert. denied,* — U.S. ——, 105 S.Ct. 1355, 84 L.Ed.2d 377 (1985); *Ensign-Bickford Co. v. Occupational Safety and Health Review Comm'n*, 717 F.2d 1419, 1421 (D.C.Cir. 1983), *cert. denied,* 466 U.S. 937, 104 S.Ct. 1909, 80 L.Ed.2d 458 (1984); *Southern Pacific Transp. Co. v. Usery*, 539 F.2d 386, 392 (5th Cir.1976), *cert. denied,* 434 U.S. 874, 98 S.Ct. 221, 54 L.Ed.2d 154 (1977); *Southern Ry. Co. v. Occupational Safety and Health Review Comm'n*, 539 F.2d 335 (4th Cir.), *cert. denied,* 429 U.S. 999, 97 S.Ct. 525, 50 L.Ed.2d 609 (1976). We hold, therefore, that the OSHA regulations at issue did apply to plaintiff's employer.

## III. *FELA and Negligence Per Se*

Plaintiff requested a jury instruction which would have required the jury to find defendant negligent as a matter of law if defendant violated an OSHA regulation and such violation was a proximate cause of plaintiff's injury. The jury instruction would also have eliminated any reduction of plaintiff's award because of contributory negligence by plaintiff. We consider first plaintiff's claim that he was entitled to an instruction on negligence per se.

■ Plaintiff's suit was brought under FELA, which creates a federal cause of action for railroad employees who have been killed or injured due to the negligence of the railroad. 45 U.S.C. § 51. FELA is basically predicated upon negligence. *O'Donnell v. Elgin, J. & E.R. Co.*, 338 U.S. 384, 391, 70 S.Ct. 200, 204, 94 L.Ed. 187 (1949). This means that if there is no statutory violation, traditional negligence principles apply. Under the traditional negligence approach, negligence per se will be found where violation of a statutory duty caused precisely the kind of harm which the statute was designed to prevent. Restatement (Second) of Torts § 286 (1965).

Under the facts of this case, negligence per se would be applicable; the kind of injury suffered by plaintiff, if caused by the failure to block the load, was undoubtedly what the requirement of blocking was meant to prevent. Two questions arise: does FELA incorporate the doctrine of negligence per se and, if it does, can this doctrine be applied to an OSHA violation? We turn to the first question.

Early in the history of FELA, many courts followed the negligence per se doctrine where violations of the major railroad safety statutes, the Safety Appliance Act, 45 U.S.C. §§ 1–16 (1982), and the Boiler Inspection Act, 45 U.S.C. §§ 22–23 & 28–34 (1982), were found to have caused an injury. *E.g., San Antonio & A.P.R. Co. v. Wagner,* 241 U.S. 476, 484, 36 S.Ct. 626, 629, 60 L.Ed. 1110 (1916). It soon became evident, however, that limiting liability for railroad workers under the negligence per se doctrine to those situations where the statutory violation caused precisely the kind of harm which the statute was designed to prevent contravened the intent of Congress to provide liberal recovery for injured railroad workers. *Kernan v. American Dredging Co.,* 355 U.S. 426, 432–35, 78 S.Ct. 394, 398–400, 2 L.Ed.2d 382 (1958) (reviewing history of application of FELA). The Supreme Court, therefore, refused to limit recovery to the negligence per se doctrine in FELA cases, holding that a statutory violation created liability under FELA if the statutory violation "contributes in fact to the death or injury in suit, without regard to whether the injury flowing from the breach was the injury the statute sought to prevent." *Id.* at 433, 78 S.Ct. at 398.

We have here a classic case of negligence per·se: the injury which occurred was precisely what the safety statute was designed to prevent. We have seen that to the extent that FELA has departed from its original grounding in the law of negligence, it has departed in the direction of liberalizing recovery. It would seem, therefore, that at the very least a violation of OSHA regulations amounting to negligence per se should be sufficient to estab-lish liability under § 1 of FELA. *See Reyes v. Vantage S.S. Co.,* 609 F.2d 140, 143 (5th Cir.1980) ("failure to follow *any* Coast Guard regulation which is a *cause* of an injury establishes negligence *per se* " under the Jones Act, which provides FELA recovery for sailors).

We now turn to the question of whether the doctrine of negligence per se can be applied to an *OSHA* regulation under FELA. As FELA developed, the doctrine of negligence per se and then absolute liability was limited to the two main railroad safety statutes, the Safety Appliance and Boiler Inspection Acts, if for no other reason than that these two Acts covered the major sources of danger to employees of the railroads. It was not until the Jones Act, 46 U.S.C. § 688, was enacted giving injured sailors the same substantive cause of action provided to railroad workers by FELA that the question arose whether violations of other safety statutes would also result in absolute liability under the principles of FELA. The Supreme Court considered this question in *Kernan,* 355 U.S. 426, 78 S.Ct. 394, a case involving a sailor who was killed when an open-flame kerosene lamp on a boat he was towing touched off flammable vapors on the surface of the water and caused the boat he was on to catch fire. The lamp was only three feet above the water, violating a Coast Guard regulation requiring that it be at least eight feet from the surface of the water. The regulation had not been enacted to prevent fires, but to make sure that navigational lights were high enough to be seen by other vessels and prevent collisions. The question was whether the violation of the Coast Guard regulation should lead to the same absolute liability under the Jones Act which had been found to result from violations of the Safety Appliance and Boiler Inspection Acts under FELA. The Court found that, with the enactment of FELA and the Jones Act, "Congress intended the creation of no static remedy, but one which would be developed and enlarged to meet changing conditions and changing concepts of industry's duty toward its

workers." *Id.* at 432, 78 S.Ct. at 398. It held, therefore, that under the Jones Act violation of the navigational statute resulted in absolute liability for the sailor's death.

Under the *Kernan* view of FELA, new safety statutes such as OSHA should be given the same treatment as well-established statutes. Therefore, FELA presents no obstacle to the application of the negligence per se doctrine to OSHA violations in a case such as this. In fact, in the context of this case, there is no difference in application and result between the doctrines of negligence per se and absolute liability; if plaintiff proves violation of the regulations and causation, defendant is absolutely liable. This does not mean that we are holding that absolute liability should apply to the violation of OSHA regulations under FELA. Plaintiff has not asked for such a ruling in this court or below and the facts of this case do not require that we decide this issue.

### IV. *OSHA and Negligence Per Se*

There is one more step to take in determining whether the doctrine of negligence per se can be applied to violations of OSHA regulations. The problem at this point stems not from FELA since there is nothing in FELA that prohibits the use of this doctrine, but from OSHA itself. 29 U.S.C. § 653(b)(4) provides that

> [n]othing in this chapter shall be construed to supersede or in any manner affect any workman's compensation law or to enlarge or diminish or affect in any other manner the common law or statutory rights, duties, or liabilities of em-

ployers and employees under any law with respect to injuries, diseases, or death of employees arising out of, or in the course of, employment.

A few courts have read this language to prohibit the application of the doctrine of negligence per se to the violation of OSHA regulations. In *Wendland v. Ridgefield Const. Services, Inc.,* a personal injury case, the Supreme Court of Connecticut reasoned that

> [a] negligence per se instruction transforms the character of the factfinder's inquiry. The applicable standard if care is affected by such an instruction. Because the standard of care is the key factor in determining liability, we conclude that the application of a negligence per se instruction affects common law rights, duties and liabilities of employers and employees ... as those terms are used in 29 U.S.C. § 653(b)(4)....

184 Conn. 173, 439 A.2d 954, 956–57 (Conn. 1981). This reasoning was followed in *Hebel v. Conrail,* 475 N.E.2d 652 (Ind.1985), a case on all fours with the case before us. In *Hebel,* the Supreme Court of Indiana overturned a lower court ruling allowing a negligence per se instruction in a FELA case for a violation of an OSHA regulation on the grounds that the language of § 653(b)(4) prohibited this use of OSHA regulations.

The Fifth Circuit, on the other hand, the only circuit court to have addressed this issue, has consistently found § 653(b)(4) no obstacle to applying the doctrine of negligence per se to OSHA violations.[5] *Dixon v. International Harvester Co.,* 754 F.2d

---

**5.** Both the Supreme Court of Connecticut and the Supreme Court of Indiana appear to have misread *National Marine Service, Inc. v. Gulf Oil Co.,* 433 F.Supp. 913 (E.D.La.1977), *aff'd,* 608 F.2d 522 (5th Cir.1979), for both cite it for the proposition that § 653(b)(4) prohibits negligence per se instructions based upon OSHA violations. *Wendland,* 439 A.2d at 957; *Hebel,* 475 N.E.2d at 657. Close reading of the *National Marine* opinion and the case it cites, *Buhler v. Marriott Hotels, Inc.,* 390 F.Supp. 999 (E.D.La. 1974), shows that this interpretation was incorrect. *National Marine* actually held that while § 653(b)(4) precluded a private right of action

based upon OSHA regulations, these regulations could nonetheless be used as evidence of negligence. *National Marine,* 433 F.Supp. at 919; *Buhler,* 390 F.Supp. at 1000. Clearly it was this latter proposition that the Fifth Circuit thought it was establishing when it affirmed *National Marine* without opinion, since its most recent citation of *National Marine* was for the proposition that "[a]lthough OSHA creates no private right of action, violation of an OSHA regulation is evidence of negligence or, in appropriate circumstances, negligence per se." *Rabon v. Automatic Fasteners, Inc.,* 672 F.2d 1231, 1238 (5th Cir.1982).

573, 581 (5th Cir.1985); *Rabon v. Automatic Fasteners, Inc.*, 672 F.2d 1231, 1238 (5th Cir.1982); *Melerine v. Avondale Shipyards, Inc.*, 659 F.2d 706, 709 (5th Cir. 1981). In doing so, the Fifth Circuit has distinguished between the use of regulations as a standard of care where the underlying cause of action is based upon either state common law or another federal statute and the derivation of a private right of action from regulations themselves:

> This Court has often held that violation of a Federal law or regulation can be evidence of negligence, and even evidence of negligence per se. . . .
>
> The mere fact that the law which evidences negligence is Federal while the negligence action itself is brought under State common law does not mean that the state law claim metamorphoses into a private right of action under Federal regulatory law.

*Lowe v. General Motors Corp.*, 624 F.2d 1373, 1379 (5th Cir.1980). Therefore, while the Fifth Circuit has found,[6] along with every other court that has considered this issue,[7] that § 653(b)(4) was designed to ensure that OSHA did not permit injured employees to bypass applicable state worker's compensation schemes through a private action in federal court, it has distinguished this limitation on the uses of OSHA from a limitation that would prevent violations of OSHA regulations from having the same consequences under already existing common law and statutory schemes as violations of any other regulatory statute. Under this view, applying the doctrine of negligence per se to violations of OSHA regulations does not create any new "rights, duties or liabilities."

▆ Before a violation of an OSHA regulation can be considered negligence per se, there must be an independent cause of action established by either state or federal law which establishes the right of an employee to be free from negligence, the duty of the employer to take reasonable precautions, and the liability of the employer for injuries caused by the failure to take reasonable precautions. Allowing OSHA regulations to act as "guides for the determination of standards of care," *National Marine Service, Inc. v. Gulf Oil Co.*, 433 F.Supp. 913, 919 (E.D.La.1977) (Rubin, J.), *aff'd* 608 F.2d 522 (5th Cir.1979), should not be viewed as expanding the liability of employers. The doctrine of negligence per se does not have the effect of turning reasonable, nontortious behavior into unreasonable, tortious behavior. Rather it simply allows the presence of a statutory regulation to serve as irrefutable evidence that particular conduct is unreasonable.

A similar analysis was made by the Fourth Circuit in a case where it had to decide whether a regulation adopted under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 901, *et seq.* (1982), could be admitted as evidence of a shipowner's negligence even though the regulation stated that

> [i]t is not the intent of the regulations of this part to place additional responsibilities or duties on owners, operators, agents or masters of vessels unless such persons are acting as employers, nor is it the intent of these regulations to relieve such owners, operators, agents or masters of vessels from responsibilities or duties now placed upon them by law, regulation or custom.

29 C.F.R. § 9.2(b) (renumbered as 29 C.F.R. § 1918.2(b) (1971)). The defendant, a shipowner who was not an employer, argued that the regulation could not be admitted into evidence because this would then have the effect of placing an additional responsibility upon the shipowner in violation of the intent of the regulations. The court pointed out the error of this argument:

> The regulation casts upon the shipowner no new duty nor does it relieve

---

6. *Jeter v. St. Regis Paper Co.*, 507 F.2d 973, 977 (5th Cir.1975).

7. *E.g., United Steelworks of America v. Marshall*, 647 F.2d 1189, 1235 (D.C.Cir.), *cert. denied,* 453 U.S. 913, 101 S.Ct. 3148, 69 L.Ed.2d 997 (1981); *Byrd v. Fieldcrest Mills, Inc.*, 496 F.2d 1323, 1323 (4th Cir.1974); *Russell v. Bartley*, 494 F.2d 334, 336 (6th Cir.1974).

him of any pre-existing duty. Now, as before the regulation was promulgated, it is incumbent upon him to supply a seaworthy ship.... The legal duty is the same. All that the regulation does is to define how this well-established duty shall be discharged in particular circumstances by the stevedore who has undertaken to perform the shipowner's nondelegable duty.... It prescribes a standard of safety, not a new duty....

Of what possible use would a safety regulation be if its sanction is withdrawn by suppressing knowledge of it from the triers of fact? How can it be determined whether a condition complained of meets the standard of safety if the jury is kept in the dark as to what that standard is?
. . .

A more reasonable reading and one that observes both the language and the spirit is that *no new duty* is to be exacted where none existed before and, equally, *no existing duty* is to be excused by reason of the regulation; but the regulation's requirement may be considered by the trier of fact in determining whether its nonperformance has resulted in a failure to meet a duty incumbent upon the defendant....

*Provenza v. American Export Lines, Inc.,* 324 F.2d 660, 665–66 (4th Cir.1963), *cert. denied,* 376 U.S. 952, 84 S.Ct. 970, 11 L.Ed.2d 971 (1964).

The legislative history of § 653(b)(4) shows that the intent of the provision was merely to ensure that OSHA was not read to create a private right of action for injured workers which would allow them to bypass the otherwise exclusive remedy of worker's compensation. This can be seen in a letter from the Solicitor of Labor to the Chairman of the House Subcommittee on Labor explaining the operation of the provision:

Dear Mr. Chairman: This is in response to your recent request for information upon which to base a reply to Mr. James E. Bailey, Legislative Counsel, American Society of Insurance Management, Inc.

In his letter, Mr. Bailey expresses concern that under proposed legislation dealing with occupational health and safety "an injured employee could claim violation of the requirements of the legislation and thus bypass the applicable state workmen's compensation benefits through an action in the Federal courts."

The provisions of S.2788, the Administration's proposed Occupational Safety and Health Act of 1969 would in no way affect the present status of the law with regard to workmen's compensation legislation or private tort actions.

Occupational Safety and Health Act of 1969: Hearings on H.R.843, H.R.3809, H.R. 4294 and H.R.13373 before the Select Subcomm. on Education and Labor, 91st Cong., 1st Sess., Part 2 at 1592–93 (letter of L.H. Silberman, Solicitor of Labor). *See also Frohlick Crane Serv., Inc. v. Occupational Safety and Health Review Comm'n,* 521 F.2d 628, 631 (10th Cir.1975) ("It would appear that by this particular provision Congress simply intended to preserve the existing private rights of an injured employee, which rights were to be unaffected by the various sections of the Act itself.").

We find the Fifth Circuit's analysis of § 653(b)(4) persuasive. Our review of the legislative history of OSHA suggests that it is highly unlikely that Congress considered the interaction of OSHA regulations with other common law and statutory schemes other than worker's compensation. The provision is satisfactorily explained as intended to protect worker's compensation acts from competition by a new private right of action and to keep OSHA regulations from having any effect on the operation of the worker's compensation scheme itself. *See United Steelworkers of America v. Marshall,* 647 F.2d 1189, 1235–36 (D.C.Cir.1981). Furthermore, we do not find that the plain language of the provision is violated by allowing the regulations to serve as standards of care under the doctrine of negligence per se; the rights, liabilities and duties of the railroad are established by FELA and not by OSHA. We hold, therefore, that § 653(b)(4) does

not prevent violations of OSHA regulations from being considered as evidence of negligence per se.

## V. *Contributory Negligence under FELA*

We next consider plaintiff's request for a jury instruction which would have eliminated contributory negligence if his injury was found to be the result of a violation of a safety statute by defendant. Under FELA, "no such employee who may be injured or killed shall be held to have been guilty of contributory negligence in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee." 45 U.S.C. § 53 (1982). Plaintiff argues that the OSHA jack regulation was a safety statute under this provision and that he was, therefore, entitled to the requested instruction. Defendant relies upon *Bertholf v. Burlington Northern Railroad,* 402 F.Supp. 171 (E.D.Wash.1975), a FELA case which held that violations of OSHA regulations would not trigger this provision. Two alternative grounds were given: elimination of contributory negligence under this provision is limited to violations of the Safety Appliance Act and the Boiler Inspection Act and OSHA regulations are prevented from having this effect by § 653(b)(4). We discuss each of these grounds.

*Bertholf* began its analysis by giving a narrow reading to *Kernan v. American Dredging Co.,* 355 U.S. 426, 78 S.Ct. 394, 2 L.Ed.2d 382 (1958), which, as we have already seen, *supra,* held that violation of any safety statute would create absolute liability under § 1 of FELA. The court felt that this broad reading of FELA should not be extended to § 53 both because "past decisions of the Supreme Court indicate that the provisio of ... § 53 applies only to violations of the Safety Appliance Act ... and the Boiler Inspection Act" and because a "massive expansion of employer liability" not contemplated by *Kernan* would result. 402 F.Supp. at 173. In fact, safety statutes other than the Safety Appliance Act and

the Boiler Inspection Act have been found to be safety statutes under this provision. In *Seaboard Air Line Railway v. Horton,* 233 U.S. 492, 34 S.Ct. 635, 58 L.Ed. 1062 (1914), the Court said: "By the phrase 'any statute enacted for the safety of employes,' Congress evidently intended Federal statutes, such as the Safety Appliance Acts ... and the Hours of Service Act...." *Id.* at 503, 34 S.Ct. at 639. Furthermore, the Boiler Inspection Act was enacted three years after the enactment of FELA, yet there is no question that a violation of the Boiler Inspection Act triggers § 53. *Baltimore & Ohio R.R. Co. v. Groeger,* 266 U.S. 521, 528, 45 S.Ct. 169, 172, 69 L.Ed. 619 (1925). Safety statutes under § 53 are, therefore, not limited to particular statutes contemplated by Congress at the time FELA was enacted. Finally, there is no indication in the legislative history that Congress intended there to be any limitation on the safety statutes which would trigger the elimination of contributory negligence under § 53. "The proviso in section 3 is to the effect that contributory negligence shall not be charged to the employee if he is injured or killed by reason of the violation, by the employer, of any statute enacted for the safety of the employees." H.R.Rep. No. 1386, 60th Cong., 1st Sess. 6 (1908). Without a clear indication from the legislative history that Congress meant anything other than what the statute plainly says, *i.e.,* that the violation of *any* safety statute shall have this effect, we see no reason to assume that the application of the proviso is in any way limited.

We also see no reason to read *Kernan* as narrowly as did the *Bertholf* court. While it may be true that the holding of *Kernan* is limited to the issue of liability under § 51, one of the bases for the Court's holding was a determination that there is no special relationship between the FELA and the Safety Appliance and Boiler Inspection Acts. 355 U.S. at 436–38, 78 S.Ct. at 400–01. Underlying this was a recognition that, with FELA, "Congress intended the creation of no static remedy, but one which would be developed and enlarged to meet changing conditions and changing concepts

of industry's duty toward its workers." *Id.* at 432, 78 S.Ct. at 398. This is directly applicable to the question of whether violation of a new safety statute such as OSHA can be given the same effect under § 53 as was given to earlier safety statutes. Under the view of FELA propounded in *Kernan,* Congress used general language such as "any statute enacted for the safety of employees" so that safety statutes enacted after FELA could be incorporated into it. It does not appear to us that extension of this view of FELA to the scope of § 53 in any way creates an *unexpected* expansion of liability as feared by the *Bertholf* court. The entire point of *Kernan* was that remedies under the FELA were meant to "evolve ... consistent with the changing realities of employment in the railroad industry." *Id.* at 437, 78 S.Ct. at 400. With the enactment of OSHA, new areas of railroad work have been statutorily recognized as posing dangers to the safety and health of railroad employees. If courts prevent these OSHA regulations from being treated as safety statutes under § 53, they will be thwarting the intent of Congress.

We now turn to the second argument in *Bertholf:* § 653(b)(4) prevents OSHA regulations from being used to eliminate contributory negligence as provided for in § 53 of FELA. We have already discussed at great length the meaning and intent of § 653(b)(4), *see supra* part IV. We believe that much the same reasoning applies here. The intent of Congress in enacting § 653(b)(4) was to prevent the creation of new tort remedies where none had previously existed. The elimination of contributory negligence for violation of a safety statute was a basic facet of the remedy provided by FELA long before OSHA was enacted. In fact, the legislative history of § 53 indicates that Congress considered this elimination of contributory negligence to be simply a reflection of the common law doctrine of negligence per se: "The effect of the provision is to make a violation of such a statute negligence *per se* on the part of the employer. The courts of some states have held this as a principle of common law. Other states have enacted it into

statute." H.R.Rep. No. 1386, 60th Cong., 1st Sess. 6 (1908). As we found earlier, allowing OSHA regulations to be given effect in other statutory or common law actions is not the same as allowing the regulations, standing alone, to create new actions. We find § 653(b)(4) no obstacle to treating OSHA regulations as safety statutes under § 53 of FELA.

## VI. *Relief*

Plaintiff has asked that if we find his requested jury instruction correct as a matter of law, as we have, that we "direct the lower Court to enter judgment for the Plaintiff in the amount of $227,000, his full damages as found by the jury, with prejudgment interest, post-judgment interest and costs." The basis of a restoration of the amount deducted below for contributory negligence, however, would be a finding that defendant violated the OSHA regulation and that this violation caused plaintiff's injury. Such a finding was never made by the jury below because all testimony concerning the OSHA regulations was struck from the record. The proper course of action, therefore, is to order a new trial which will be guided by our legal analysis. We do not consider plaintiff's request for prejudgment interest. This argument was not raised below and should be raised in that forum initially.

Costs to appellant.

*Reversed and Remanded for proceedings consistent with this opinion.*

CAMPBELL, Chief Judge (dissenting).

I would affirm the district court.

While my colleagues' reading of the OSHA safety regulation pertaining to jacks is one possible construction, the district court's reading was also reasonable. Facially it is not clear whether 29 C.F.R. §§ 1910.241(d)(1) and 1910.244(a) were meant to apply to a device of the type plaintiff was using when injured. I believe that before we take the draconian step of removing from the jury the issues of negligence and contributory negligence due to

an alleged OSHA violation, we should at least require that a clear cut violation of the OSHA statute be made out.

Ordinarily, perhaps, if a regulation is ambiguous, it may be viewed as raising a question of law upon which an appellate court should have the final say. But the construction of OSHA regulations is peculiarly the province of the Secretary of Labor who promulgates them. *See Donovan v. A. Amorello & Sons, Inc.,* 761 F.2d 61 (1st Cir.1985). Where the OSHA regulation is ambiguous, it is difficult for an employer to know that it is even violating the regulation (and hence the OSHA statute) until and unless the Secretary construes the regulation as applying. Since we do not have an administrative interpretation that this ambiguous "jack" regulation covered the device in question, I think we should not regard the regulation as applicable for purposes of this case.[1] At the very least, we should accept the narrower construction of the district judge, that construction being perfectly reasonable.

OSHA contemplates that regulations adopted by the Secretary of Labor will be enforced, clarified, and interpreted by the Secretary in the course of OSHA administrative proceedings. The Secretary decides in the first instance whether or not he thinks a regulation covers a particular industrial situation, and issues citations for violations only if he believes it does. In practice, the Secretary may mitigate or defer penalties if he feels the wording of the regulation was so unclear as not to put the employer on fair notice in the first instance. And the expertise and interpretation of the Secretary are matters to which any reviewing court must give substantial deference where, as here, the regulation is unclear on its face. *See Donovan v. A. Amorello & Sons, Inc.,* 761 F.2d 61.

Both this court and the defendant carrier lacked an administrative interpretation by the Secretary of Labor in the present case. In these circumstances, how can we know for sure that the carrier was actually in violation of a safety *statute, i.e.,* of OSHA? We are not dealing with a legislative enactment which a court is best equipped to construe; this is a regulation written by the Secretary of Labor for enforcement in a unique administrative context. Only the Secretary is empowered to determine its applicability in the first instance. Where the Secretary has, in effect, primary jurisdiction to interpret the regulation and has not done so, I do not think this court should undertake its own interpretation unless the *regulation is so clear on its face* as to make it possible to say, without hesitancy, that the Secretary would treat the conduct in question as a violation of the OSHA statute.

The majority's finding that defendants violated the ambiguous jack regulation operates against the defendant railroad in two respects. First, because violation of a statutory standard results in a finding of negligence per se, it removes the issue of negligence from the jury. In addition, it removes from the jury the issue of contributory negligence, since 45 U.S.C. § 53 bars the reduction of damages on account of contributory negligence where a common carrier has violated "any statute enacted for the safety of employees". For practical purposes, of course, the finding of negligence per se has little effect in the instant case. At trial, plaintiff was able to convince the jury of defendant's negligence without the benefit of evidence of the OSHA regulation. The bar on contributory negligence, on the other hand, has a much more significant impact, for the jury found plaintiff to be 80 percent contributorily negligent, and the district court reduced plaintiff's damage recovery proportionately. By finding that the defendant violated the ambiguous jack regulation, this court

---

**1.** I know of no way to secure an advisory opinion from the Secretary of Labor. It is too late in the day to do so, anyway. We review the record made in the district court and that court was not presented with any evidence showing the Secretary or his agents had construed the regulation as applicable here.

permits the plaintiff to recover in full despite his proven negligence.

The advantage of the district court's narrow, strict construction of the jack regulation is that it avoids laying a special penalty on the railroad in a hazy situation where, *ex ante,* it could not have known for certain it was violating anything. It scarcely seems unjust to let stand a judgment that, as in most FELA cases and tort cases generally, reduces a plaintiff's recovery for the proportion of damages attributable to his own negligence. The plaintiff had his day in court and came away with a considered judgment of a jury of his peers. This court strips the railroad of a customary defense in mitigation of damages—contributory negligence—by construing against it an ambiguous regulation over which the Secretary of Labor, who has not spoken, has primary jurisdiction. I do not think that Congress, when it enacted 45 U.S.C. § 53, intended to remove the consequences of a plaintiff's own contributory negligence in such slippery circumstances,[2] nor do I think we should put the taxpayers and the defendant to the expense of a second trial where the district court's reading of the ambiguous regulation was, though not the only possible reading, a perfectly reasonable and defensible one.

---

**2.** It should be borne in mind that there are innumerable OSHA regulations, some of them highly technical and relating to very specialized trades and industries, where the Secretary's own expertise is an important factor in determining their meaning and scope. *See, e.g., GAF Corp. v. Occupational Safety & Health Review Comm'n,* 561 F.2d 913, 920–21 (D.C.Cir.1977) (MacKinnon, J., concurring). If an OSHA regulation were clear on its face, I might agree with my colleagues' analysis that it could be the basis for finding the violation of a safety regulation for purposes of 45 U.S.C. § 53. My concern here relates to an ambiguous regulation which may or may not apply. In such a situation, I think railroad employees are adequately protected in a jury trial applying the normal principles of negligence law.